1831.

MASON
v.
MASON.

Mason *vs.* Mason.(*a*)

The propensity to drink to intoxication is not, of itself, a ground for divorce *a mensa et thoro.*

If the consequences of intoxication produce bodily injury or endanger the wife's personal safety, there the court will interfere.

Occasional sallies of passion, from whatever cause, do not amount to legal cruelty, so long as there is no threat of bodily harm.

To constitute *sævitia* of the civil law, bodily injury or an act of personal violence is not necessary. It is made out, if there be a series of unkind treatment, accompanied by words of menace creating a reasonable apprehension that bodily injury may result to the wife, unless prevented. Still, the causes for apprehension must be weighty and show an impossibility that the duties of the married life can be discharged.

Sir William Scott's definition of legal cruelty given and sanctioned.

July 20,
1831.

Divorce a
mensa et
thoro.

BILL by the wife against her husband for a divorce *a mensa et thoro* on account of alleged cruelty.

Amongst other things, the bill showed, that after the marriage of the complainant and defendant and before the settlement thereinafter mentioned, her husband had been once absent four or five years, and was in the habit, afterwards, of being absent for months at a time, under pretence of business; and that to guard against accidents and provide a maintenance for complainant, by an instrument dated the first day of December one thousand eight hundred and twenty-three, he vested in trustees one hundred shares of United States Bank stock, upon trust to receive and pay the interest and dividends to the complainant during their joint lives, and after his death, to her during her life or widowhood, but to cease at the termination of either; that on the fourth day of November one thousand eight hundred and twenty-four she gave birth to a female child, then living, and then and ever since its birth under the complainant's charge;

(*a*) There was an appeal to the Chancellor in this case; but the decision of the Vice-Chancellor was affirmed.

that notwithstanding her husband's cruelty, she was always obedient and faithful from the time of their marriage to that of their separation, which conduct on her part would, she hoped, have entitled her to kindness on his; that her husband, on the contrary, had been for two years in intemperate habits and in the practice of cruelty to her, especially when intoxicated, so much so as to endanger the complainant's life and safety, not only threatened violence, but actually committed it, and repeatedly and at that time threatened to deprive her of her child, and particularly on the tenth day of November one thousand eight hundred and twenty-four, six days after the birth of her child, threatened to carry the child to North Carolina, and was so abusive in his language and outrageous in his behaviour as to alarm and agitate her to a dangerous degree; that the next day and daily for two weeks thereafter he behaved more brutally still, and was, during that period, almost entirely intoxicated; that he left New York in the December following, and did not return until the fourth day of July one thousand eight hundred and twenty-five; his habits of intoxication still continued; and on the first day of September in the same year he was so violent and abusive, that the complainant fled with her child for safety to her father's house, where, through fear, she was thrown into a severe fit of sickness; that, subsequently, and until he left New York in the fall of one thousand eight hundred and twenty-five, his conduct was the same; that in June one thousand eight hundred and twenty-six he returned to New York, conducting himself, except during a short period of sickness, with (if possible) more brutality than ever, until the beginning of October, (same year,) even threatening her life; that on the fifth of said month of October he caught her by the throat and attempted to choak her, in which he was prevented by her screams; that on the eighth day of the said month, he took the child from the house, under pretence of walking; that the complainant, apprehensive of his design, went along, but was abused again by the defendant, who said, he meant to take the child to Philadelphia, but complainant got possession of it about nine o'clock at night and fled to a friend's house, and next morning took board for herself and child in a private family,

where she had ever since resided; that all the instances of cruelty enumerated took place in the city of New York; that in consequence of such conduct the complainant deemed it improper to cohabit with him; and that, from his habits and the child's tender age, he was an improper gurdian for the same; that since the separation, he had frequently threatened to take away the child, which she was fearful he would do unless restrained by the court.

The bill concluded with a prayer for an injunction to restrain the defendant from taking or interfering with the custody of the child; and for a subpœna *ad respondendum,* the object being a decree of divorce *a mensa et thoro;* the custody of the child by the complainant; and for maintenance of herself and child, &c.

The defendant put in an answer. He admitted the residency and inhabitancy of the complainant as charged in the bill; and he also admitted the marriage. Stated, that at the time of his marriage and for many years previous, he had been and was an inhabitant of the South, and at the time of his marriage resided in Petersburgh, Virginia, where, and in Halifax, North Carolina, he had a store, but intended Petersburgh as the place of residence for himself and wife, and had accordingly taken a house there; that he rented a house and store at Petersburgh for eight hundred dollars, but that his wife, through caprice, insisted on going to board, which, to gratify her, he did, though to his own inconvenience and at great expense; and that they remained at board for six months in comfort and happiness, when she took a fancy to visit her parents in New York, and in which he gratified her; and that having spent some time there, she refused to return and he was compelled to do so without her, she having ever since remained there, and in this manner and during the intervals of his visits to her he was separated from her, but never so of his own accord, his business at Petersburgh and Halifax requiring his presence at those places; that he changed his residence from the former to the latter place in the fall of one thousand eight hundred and eighteen and had since kept house and resided at the latter place; that his allegations of business were not pretences, but truth; that after leaving

1831.

MASON

v.

MASON.

the complainant at New York and in August one thousand eight hundred and nineteen, finding one of the partners at Halifax unfaithful, he was compelled to remain there until he could collect the goods and debts of the establishment. On the first of January one thousand eight hundred and nineteen, having sold his stock in trade at Petersburgh to a commercial house on long credits, and their solvency being suspected before the first payment fell due, his personal attention became necessary to recover back his property; that on a visit to New York in the summer of one thousand eight hundred and nineteen, he told his wife of his embarrassments, and that, unless she would reside with him at the South, he must, of necessity, be absent from her for long periods, but she persisting in remaining, he returned to Halifax without her and was absent a year; he made her another visit in the summer of one thousand eight hundred and twenty and again returned to Halifax without her (she refusing to accompany him;) and he did not, from the necessity of his business, return to New York until the year one thousand eight hundred and twenty-three.

The defendant also stated, that during the last mentioned absence, and during all other absences, he corresponded with his wife and consigned goods and moneys to her father, Archibald Davie, (at whose house she always resided at New York,) with instructions to advance moneys to her, on this defendant's account, which said Davie did; that the defendant returned to New York in the year one thousand eight hundred and twenty-three, Davie being at that time in his debt twenty thousand dollars for goods and moneys of defendant's in his hands; that the defendant did not make the settlement of the one hundred shares of United States Bank stock on his wife to provide for her in case of accident, but to compel the said Davie to a settlement of his account with the defendant: he refusing, otherwise, to come to an account, although threatened by the defendant with a suit at law; and that Davie, as an inducement to the said settlement, offered to convey to the complainant and her heirs a house and lot in New York; that being unable to raise funds in New York for the purchase of goods, or obtain the society of his wife or save himself, unless he complied, he was

36

forced to make the settlement proposed; that the stock had been purchased by Davie with the defendant's money, according to instructions, but in his own name, for which he had no authority; that the defendant made the settlement for the reasons aforesaid and none other; that after the said settlement was executed, Davie refused to convey the house and lot, and tore up a written promise in that behalf, which had been laid for a moment on the table by their mutual friend Robert M'Crea. The defendant admitted the birth of the child and the care and protection of it by the complainant, though not exclusively so, but at the expense of the defendant. He denied the cruelty and personal violence to compel a separation; and also denied there being a dutiful and obedient conduct on her part, although he admitted that no disobedience of hers, except as stated, merited any ill treatment from him; and denied that she ever received any such ill treatment. He denied the charge of intemperance, ill treatment and opprobrious language, or that she ever entertained fears for her life or personal safety, or had cause to do so. He denied having threatened to take away the child in order to torture her feelings, but had told her, when she refused to accompany him to the South, that he was entitled to the protection of the child and would take it with him. He denied the charge of ill treatment on the tenth day of November one thousand eight hundred and twenty-four (six days after the birth of the child) or that his treatment of her afforded any ground for apprehension for her life in consequence of alarm and agitation; and denied the charge of intoxication and cruelty on the succeeding day, &c. He admitted, that in December following he went to Halifax, North Carolina, and did not return to New York until the fourth day of July one thousand eight hundred and twenty-five, but denied the charge of habitual intoxication, or that, on the first day of September in the same year, his conduct alarmed her for her personal safety, though he admitted that on that night she left his house and staid at her father's hard by, but returned next morning with the child and remained with the defendant. He denied the charge of any subsequent ill treatment up to November one thousand eight hundred and twenty-five, when he left New York; admitted he

returned to New York in June one thousand eight hundred and twenty-six, but denied ill treatment and attempting to choak her as was alleged in the bill.

The defendant further said, that on the eighth day of the said month of October, returning home from another part of the city, he found the complainant and child dressed to take a walk; that he accompanied them, carrying the child in his arms; denied abusive treatment; that in consequence of a dispute between them about the settlement, he, at first, refused to let her have the child, but, afterwards, consented; the dispute about the settlement was in consequence of her refusal to defray the family expenses out of it, but she finally consented at the residence of Robert M'Crea, one of the trustees in the settlement, to give up to the defendant fifty shares of the stock, while the remaining fifty shares were to be invested in real estate in her own name. From this agreement, however, she was dissuaded by her father and mother. That, while in the house of Mr. M'Crea as aforesaid, she absented herself therefrom with the child and went to the house of William Steele; that at the time of his answering, up to the fourteenth day of November last, she had resided with her father, but whether at board the defendant was ignorant; that the defendant had always, since their marriage, treated the complainant with proper attention, keeping house at the expense of fifteen hundred dollars per annum, since the first day of January one thousand eight hundred and twenty-four, for her sake only, besides a house at the South, to the expense of which she would not contribute, although the same was always open to receive her; that having, in one of her letters, expressed a willingness to reside at the South, he purchased a carriage for her convenience solely. That the complainant having left defendant's house without cause, was not entitled to the protection of the child. That the settlement made in her favor was as much as the defendant could afford, being equal to a third of the most active part of his property. That during the marriage, with the exceptions before mentioned, and about two months absence before the execution of the deed of settlement, and down to their separation in October one thousand eight hun-

dred and twenty-six, they had always cohabited as man and wife.

A general replication was filed to the answer by the complainant; and witnesses were regularly examined on both sides.

On the opening of the cause, the counsel for the defendant made an offer on the part of their client, that the latter was ready to receive the complainant, if she would go back to him.

The evidence is sufficiently detailed in the opinion of the court.

Mr. *William Slosson,* for the complainant.

Mr. *Henry W. Warner* and Mr. *James O. Grim,* for the defendant.

*September 5,*   THE VICE-CHANCELLOR. I must examine, with some particularity, the proofs in this cause: in order to ascertain whether there is enough shown to justify the complainant in separating from her husband and to entitle her to the interference of the court.

Frequent intoxication constitutes the principal, if not the only source from whence has proceeded the misconduct of which the wife complains. It is in evidence, from the defendant's admissions, in letters which he wrote to his friends during the year one thousand eight hundred and twenty-three, that he had been addicted to the use of ardent spirits and had contracted bad habits of drinking; and from the testimony of witnesses it appears, that, both at the South and in the city of New York, he occasionally indulged in it to intoxication; although, no witness has given him the character of an habitual drunkard.

I cannot admit this propensity or the occasional or even frequent indulgence of it to be, of itself, a sufficient ground for a bill of this kind. The court is not to add to the deplorable consequences of intemperance, by making it, however excessive, the sole cause for severing the conjugal tie. It has no such power. When a husband falls into this vice, he may require,

1831.

MASON
v.
MASON.

more than ever, the watchful attention, care and kindness of a wife in order to win him back to the paths of virtue and sobriety; and I should strongly reprobate the policy of a law, which should make intoxication alone a sufficient ground for separation or divorce. Still, if the consequences of intoxication are visited upon the wife, or the same is made the foundation of a course of aggression, so as to produce bodily injury or endanger her personal safety while cohabiting with him, it is then the law interposes in her behalf and gives to this court its authority to separate the one from the other.

The evidence in this cause discloses only one instance in which any thing approaching to personal violence has been the consequence of the defendant's inebriety. This occurred in the month of August one thousand eight hundred and twenty-five. The persons then present, and who speak of the transaction, are John T. M. Davie, who is the complainant's brother, Miss M'Phail, a mantua-maker who had been employed in the family five or six days, and William Steele. According to Miss M'Phail's relation, the defendant came home in the evening intoxicated and behaved abusively towards his wife, using indecent and abusive language, in terms which the witness was not willing to repeat. The complainant appeared to be intimidated and alarmed, and sent for Mr. Steele, their neighbour, who came to the house and took the defendant out to walk with him. In the mean time the complainant left her home and went to her father's dwelling. This witness testified, that previous to the period now referred to, she saw nothing improper in the behaviour of the defendant towards his wife; and she did not at that time see him strike her.

John T. M. Davie gives a different, and, I cannot but believe, an exaggerated account of this affair. He says, that on coming to the house that evening he observed that there was some disturbance; and discovered the defendant was intoxicated. At the entrance of the house he met Miss M'Phail, and in the passage, Mr. Steele, who requested the witness to keep quiet and he would endeavour to pacify the defendant. While in the passage, the defendant made use of very abusive language towards the complainant, applying gross and vulgar epithets,

which the witness details; and he says, "menaced her with" "blows in such a manner as to leave him with an apprehension" "that he meant to strike her," insomuch, that the witness sprang forward to prevent any violence being committed. The complainant, it appears, then went into the back room, and, from thence, up stairs; and Mr. Steele induced the defendant to take a walk with him. In his absence, the complainant left the house and went to her father's, requesting the witness to inform her husband she would return the next morning and talk to him on the subject of his conduct.

Mr. Steele, who must be considered a more disinterested and impartial observer of what took place, says, on being sent for he went to the house; he heard loud talking and altercation; and the complainant remarked to him, that the defendant was abusing her with his tongue. Witness told her, it was not worth minding, as the defendant was in liquor. During the time he was present, he heard no language addressed to the complainant or applied to her but such as he may have heard occasionally in his own family. The defendant, however, he says, used abusive language against the complainant's father of a very violent nature, and calculated to wound her feelings; but he did not hear the defendant give the complainant any bad name. With a view to pacify the defendant, the witness invited him to take a walk, which he did. He soon became orderly; and when they returned, which was in about a quarter of an hour, the witness left him at the door. Mr. Steele further states, he did not perceive it was absolutely necessary for the safety of the complainant that she should have left the house.

The dispute appears to have arisen from the defendant's declaring, that if the complainant would not go to the South with him, he would take the child. The settlement of December one thousand eight hundred and twenty-three also formed a part of the dispute; and it is probable the name of the father was mentioned in connection with this part of the matter. The misunderstanding, however, ended with the excitement which produced it; and the moment that subsided, there was no longer any apprehension for the complainant's personal safety. She, indeed, returned the next morning.

1831.

MASON
v.
MASON.

There is evidence, it is true, from her physician to show, that the agitation of mind into which she was thrown produced an indisposition rendering medical attendance necessary. But we have, at the same time, the best evidence of the defendant's kindness and good feeling, when sober, in the fact testified to by the physician: of his expression of regret at what had happened and his great anxiety for her welfare.

In my judgment, this occurrence, taken by itself, is not sufficient to authorize the court to interfere. It was an instance of misconduct on the part of the husband; but not of a character or description which the law contemplated or intended to guard against in providing a remedy in this court for the wife. There must be a more settled and deliberate course of misconduct, before the court can lend its aid. Occasional sallies of passion, from whatever cause, do not amount to legal cruelty so long as they do not threaten bodily harm; and, taking the evidence together, I am at a loss to discover, on the occasion just adverted to, any thing to create a serious apprehension of personal injury or danger to the wife.

There is one allegation which, if proved, would go far to establish her case. I allude to the charge in the bill, that, on the tenth day of November one thousand eight hundred and twenty-four, six days only after the birth of her child and while she was very ill in consequence of her confinement, the defendant used the most abusive and profane language to her, and threatened to take the child away and carry it to North Carolina; and behaved so outrageously and the complainant became so alarmed and agitated, that her nurse and attendants were apprehensive of serious consequences to her life. This is a very grave charge against the husband; and one would suppose it to be susceptible of direct proof. She here vouches her nurse and attendants as witnesses; and if conduct so monstrous and brutal really took place, and attended too with such consequences, it is hardly possible to believe it could have escaped their observation. And yet, what is the testimony? Elizabeth Sellars, the nurse, is the only witness examined in relation to it. She says, shortly after the complainant's confinement, she observed her to be in tears; and the witness took occasion to

observe to the defendant, that if he had said any thing unkind to the complainant, it was a very improper time, for the consequences might render it necessary to get a nurse for the child.    She did not know he had used any improper language towards the complainant.    She had seen them several times conversing together; and seeing the complainant's distress, and not knowing or suspecting any other reason for it, the witness was induced to speak to him in the manner she did.    This witness then adds, that the conduct of the defendant, while she was in the house (a period of four weeks) was kind, and witness had no cause to suspect he was unkind on the day alluded to; but still she suspected some unkindness on the part of the defendant; because she did not see any other cause for the distress of the complainant.    With respect to this witness, it is a little remarkable, although she says that during the complainant's confinement she, the witness, was her constant attendant and saw the defendant daily, that she never saw in him any of the unkindness which she suspected; and we are not told she ever heard the wife whisper a word of complaint.    Indeed, so far from it, she says the complainant told her that the defendant wished her to stay about two weeks after her four weeks had expired.    The extent of this person's testimony amounts to this—she entertained a suspicion unfavorable to the kindness of the defendant towards his wife, created by seeing the latter one day in tears, but without any other fact or circumstance coming under her observation to authorize such a suspicion; and to which much stronger circumstances are opposed.    Such, for instance, as the wife's never having been heard to complain; and the fact, stated by the witness herself, that the conduct of the defendant was kind and attentive during the period of his wife's confinement.

This testimony falls far short of its object.    It does not in the least degree militate against the defendant in respect to this charge in the bill—a charge which, if true, would not only justify the wife in all she has done, but would call down the severest censure of the court upon the defendant.

There are other circumstances in the case which require consideration. . I allude to what took place in October one

1831.

MASON

v.

MACON.

thousand eight hundred and twenty-six; and which led to the separation of the parties and the filing of the bill almost immediately afterwards. About this time, the defendant was preparing to go, as usual, to North Carolina; and was desirous of taking his family with him. The complainant refused. On former occasions, he had solicited her to accompany him and reside there; and once he wrote to their mutual friend, Mr. M'Crea, to use his kind offices with the complainant and persuade her to leave New York: but this she had uniformly refused. This was, consequently, a frequent source of controversy; especially when he happened to be under excitement from liquor. Another subject gave rise to dispute : the complainant regularly received the dividends on her bank stock, which she invested so as to accumulate for her individual benefit, instead of applying the same towards defraying her family expenses, and which he insisted she ought to do. While under a state of feeling which these causes naturally enough produced, the time for his departure approached; and the complainant charges, that he repeatedly threatened to carry away the child and did commit an act of personal violence upon her (the wife:) but of which there is not the smallest evidence.

It does appear, however, that about the eighth day of October, the defendant came home from some other part of the city, partially intoxicated; and, finding the complainant and her child dressed for the purpose of taking a walk. he went out with them; that on leaving the house or shortly afterwards, he took the child in his arms, and on some words arising between the complainant and him, he did say he would immediately set out with the child for Philadelphia, and refused to give it back to its mother. He went, however, with the child in his arms, to the house of Mr. M'Crea; and the complainant accompanied him. When they came in, the complainant appeared to be agitated and requested Mr. M'Crea to go for her counsel; they were in a dispute; the defendant said he was going to take the child with him to the South, to which the complainant objected; and while in the house he still kept the child in his arms and refused to give it to the complainant. The dispute, it appears, was concerning the bank stock and its dividends. The defen-

37

dant required of her to relinquish one half of the stock to him; and his object in withholding the child from her seemed to be, for the purpose of inducing her to consent to such relinquishment. She finally appeared to acquiesce; and he sat down to the table for the purpose of writing the form of a relinquishment. In doing this, he put the child upon the floor; and presently the complainant, unobserved by him, took the infant and made her escape from the house. Mr. M·Crea was present, and states that the defendant did not express any improper language towards the complainant at the time; and that, although he said he was going to take the child to the South, it gave him no uneasiness, as he knew the defendant was not prepared to take the child at this time. A short time after the complainant had left the house with the child, her father and mother came in; and angry and quarrelsome words ensued between her father and the defendant. In the course of it, the former attempted to strike the latter, but was prevented by Mr. M·Crea. The complainant, on leaving Mr. M'Crea's, did not go to her own house, but went to some friends who received her. The defendant returned home; and, it would seem, remained some time, but how many days does not distinctly appear, in ignorance of the complainant's place of retreat. This was the separation which led to the breaking up of their housekeeping; and preceded, but a little, the filing of the bill.

Is there, then, any thing shown in the whole course of the defendant's conduct, in relation to his wife, which this court can lay hold of as a ground for divorce *a mensa et thoro?* I apprehend not. I can readily perceive much unhappiness; but this is not sufficient. The remedy is elsewhere. To use the language of a learned judge, " courts of justice do not pretend to " furnish cures for all the miseries of human life."

I have no doubt the defendant has, in some respects, been unmindful of the obligations of a husband; and it is equally certain there is much in his habits and conduct to reprehend. But, I am at a loss to discover the cruel and inhuman treatment or the conduct towards his wife which has rendered it unsafe and improper for her to cohabit with him, so far as to authorize

the court to interfere and place her beyond his dominion and control.

It is true, that to constitute *sævitia* known to the civil law, and which forms one ground for the jurisdiction of the ecclesiastical courts in cases between husband and wife, it is not necessary there should be an infliction of bodily injury or any act of personal violence committed. It is sufficient, if there be a series of unkind treatment, accompanied by words of menace, creating a reasonable apprehension that bodily injury may result to the wife, unless prevented. Still, the causes for such apprehension (says Sir William Scott in *Evans* v. *Evans*, 1 *Hag. Con. Rep.* 57) must be grave and weighty, and such as show an absolute impossibility that the duties of the married life can be discharged; and all which falls short of this, is to be admitted with great caution. The same distinguished judge further tells us, "mere austerity of temper, petulance of manner, " rudeness of language, a want of civil attention, even occa- " sional sallies of passion, if they do not threaten bodily harm, " cannot amount to legal cruelty; and that which merely " wounds the mental feelings is, in few cases, to be admitted, " where they are not accompanied with bodily injury either " actual or menaced."

We have thus a pretty clear idea of what is and what is not cruelty in the legal sense of the term. And it appears to me the case under consideration falls much more aptly within the latter than the former part of the description. On the part of the defendant, when excited or stimulated by liquor, there has been occasionally a rudeness of language, with sallies of passion, and conduct wounding to the moral and mental feelings of the complainant: but, after a careful examination of the evidence, I have not been able to discover any facts showing such a degree of misconduct and ill treatment as makes out a case of legal cruelty.

But it is said: the statute which confers upon this court jurisdiction in these cases, has placed divorces *a mensa et thoro* upon broader grounds than are assumed by the courts in England. The original statute, but more especially the Revised Statutes, have specified " cruel and inhuman treatment," and

" such conduct on the part of the husband towards his wife as " may render it unsafe and improper for her to cohabit with " him," as, apparently distinct causes of divorce : and yet, I do not well perceive how they can be distinguished; because that which would render it " unsafe and improper," could not be any thing less than *cruelty,* according to the definition we have received. It must be actual personal violence, menaces or threats, creating reasonable apprehension of bodily harm, which could alone render it " unsafe" for a wife to remain with a husband; and those very acts would constitute a case of " cruel and inhuman treatment." They appear to me synonymous and convertible terms. Chancellor Kent has, I think, favored this construction. " Probably," says he, " the word " *unsafe* in our statute may mean the same thing as the reason- " able apprehension of bodily hurt in the English cases:" 2 *Kent's Com.* 126, *2d edit.;* and see his opinion in *Barrere* v. *Barrere,* to which he refers.

The other cause for divorce which the statute mentions, viz. abandonment and refusal or neglect to provide for the wife, has certainly created a broader ground of jurisdiction than is exercised in England. In no other respect, as I apprehend, did the legislature intend to give the court greater or other powers over the subject of divorce than is possessed by the tribunals in the mother country—prescribing, however, a different sentence or decree.

I have thus far only examined the conduct of the defendant towards the complainant; and the law which is applicable between them as man and wife ; and I have not been able to bring my mind to any other conclusion, than that the complainant has entirely failed to make out a case sufficient to justify a separation. She accepted the defendant as her husband, under obligations which she, as a wife, must discharge. It may have been an injudicious marriage, but it must be adhered to. By mutual forbearance and prudent conciliation, they must endeavour to lessen, if they cannot entirely remove, the causes which have produced such disagreement and unhappiness.

The defendant, by a petition presented to the court on the hearing, expresses a strong desire to have the complainant

return and live with him, promising to bestow every attention upon her and the two children (one child having been born since the filing of the bill) and to forget all former differences, and treat her on all occasions with kindness and attention. I can entertain no doubt of his sincerity in making the offer; but I am only able to recommend her acceptance of it.

There are several topics, which were strongly urged in the argument against the complainant, in regard to her own conduct: such as, her refusal to go and reside with him at the South, and, combining with her father in order to coerce the defendant into a settlement of the bank stock upon her. These circumstances, it is said, have been the cause of much of the difficulty and unhappiness complained of; having produced a continued irritation in the mind of the defendant. It is unnecessary to express any opinion upon this part of the case. I, therefore, forbear to examine it. She still remains the wife of the defendant; and having failed to prove enough to justify a separation from her husband, I must, without examining into her own conduct, hold her bound to the performance of all her conjugal duties.

The bill must be dismissed; and, considering it was filed immediately after the separation and under circumstances which did not justify the complainant in so hasty a step, and that she possesses ample means, arising from the income of the settlement made upon her by the defendant, I shall decree against her the costs of the suit.