ROBINSON *v.* ROBINSON.

Any behavior of one party which affects the other physically or mentally is within the meaning of the statute granting divorce, when either party has so treated the other as seriously to injure health or to endanger reason.

Whether the treatment proved has seriously injured the health or endangered the reason of the libellant is a pure question of fact.

Whether such treatment reasonably ought or could reasonably be expected to injure the health or endanger the reason of an ordinary person is immaterial.

LIBEL for divorce, filed February 24, 1890, charging extreme cruelty, treatment seriously injuring health, and treatment seririously endangering reason. The parties were married at Littleton November 28, 1882. The defendant has resided in Littleton since 1855, and the plaintiff since 1879. In 1884 the defendant became interested in the subject of Christian Science, and a believer in its doctrines. She attended lectures and courses of instruction in the science, and received the degree of "Doctor of Christian Science." In the fall and winter of 1884 she practised as a Christian Science doctor in Binghamton, N. Y., returning to Littleton about the first of January, 1885. For about a year after her return she refrained from practice at the request of her husband. About the first of January, 1886, she resumed practice in Littleton, and has continued to practise to the present time. The

plaintiff did not believe in the doctrine, and had no sympathy with the defendant in her advocacy of it or in her practice under it. On the contrary, he regarded it as fanaticism and utter foolishness, and was annoyed and irritated thereby.    He did not object to her belief in the doctrine, but he was opposed to her practising as a doctor, which the defendant well knew, and he frequently requested her to give it up.

Twenty witnesses, including four physicians, called by the plaintiff, testified in regard to his health, bodily and mental, since his wife became a believer in Christian Science, as compared with his condition previously.    For the two years next after their marriage they appeared to live as happily and contentedly as people in general.    His health was good.    He was sociable and jovial.    They went into company together, and received visitors at their home. After she became interested in the subject of Christian Science, some of her most intimate female friends were women also interested in the doctrine.    The plaintiff and the defendant appeared in public together, and mutual friends called upon them less frequently. He knew that unfavorable comments were made in regard to his wife's attempting to practise as a Christian Science doctor; that she was the subject of ridicule in this respect among some people; and that the physicians of Littleton entertained unkind feelings toward her for interfering, as they regarded it, with their practice. He also knew of rumors of malpractice in one case, and that a prosecution therefor was contemplated.    His business, which was that of a druggist, suffered.    The tendency of this state of things was gradually to alienate his affection for his wife.    He was naturally proud, sensitive, and reasonably ambitious, besides being somewhat passionate and hasty.    He became moody, morose, reticent, and to some extent inattentive to his business.    He was troubled occasionally with insomnia and loss of appetite, and became generally despondent, discontented, and unhappy from brooding over his changed domestic relations.    The plaintiff left his wife July 19, 1889.    At the end of six weeks he went back to see whether their differences could be adjusted; if not, he intended to apply for a divorce.    He wished her to give up practice : she refused.    He called again : she declined to see him.    He then sent a third person, who informed her that the plaintiff was willing to go back if she would give up practice—that he did not ask her to give up her belief in Christian Science : she replied that she did not believe it was her duty to give up practice, and sent word to the plaintiff that if he would come back it must be on the basis of Christian Science,— meaning that he should permit her to do what she deemed right—to go whenever and wherever she believed it right to go.    No further attempt at reconciliation was made.    The causes above mentioned operated upon the abnormally sensitive nature of the plaintiff, and have seriously injured his health.    The defendant, in embracing and practising Christian Science, intended no

injury to her husband or to his business.   She did not believe and
ought not reasonably to have anticipated that her advocacy of the
doctrine would seriously injure his health or seriously endanger
his reason.   She is sincere in her belief in the truthfulness of the
doctrine.   It was admitted on the trial that "she treated her hus-
band as well as a wife ought until she embraced Christian Science,
barring the failings incident to humanity."   Testimony was intro-
duced as to her character for kindness, tenderness, generosity, and
peaceableness as woman, wife, mother, and neighbor : the evi-
dence established that her character in these respects is good, and
that she possesses all these qualities.

*E. Aldrich, Bingham, Mitchell & Batchellor,* and *J. W. Remick,*
for the plaintiff.

*Ossian Ray,* for the defendant. ⋅ The plaintiff is not entitled to
a decree on the ground that Mrs. Robinson has (1) so treated her
husband as seriously to injure his health, or (2) has so treated him
as seriously to endanger his reason.

Enough is shown in the reserved case to satisfy an impartial
mind that Mrs. Robinson's belief in the doctrine of Christian
Science is a matter of genuine and conscientious religious faith
upon her part.   She is as sincere in her belief that true Christian
Science will cure disease now, as in the days of Christ and the
apostles.   She is just as conscientious in regard to the peculiar
doctrines of her religion, as Roman Catholics, High or Low
Church Episcopalians, Presbyterians, Close Communion Baptists,
Campbellites, Mohammedans, or Buddhists are in the belief that
their peculiar forms of religion will insure their ultimate salvation.

Our New Hampshire Bill of Rights, Art. 4, declares that " among
the natural rights some are in their very nature unalienable, because
no equivalent can be given or received for them.   Of this kind are
the rights of conscience."

Article 5 says,—" Every individual has a natural and unalien-
able right to worship God according to the dictates of his own
conscience and reason ; and no subject shall be hurt, molested, or
restrained in his person, liberty, or estate for worshipping God in
the manner and season most agreeable to the dictates of his own
conscience, or for his religious profession, sentiments, or persua-
sion, provided he doth not disturb the public peace, or disturb oth-
ers in their religious worship."

Mrs. Robinson has never disturbed the public peace, nor dis-
turbed her husband or others in their religious worship.   She is
not to be " hurt, molested, or restrained in her person, liberty, or
estate " by her husband or the court on account of her religious
faith, because that would be a violation of what is termed in Art.
4 as a right of conscience, a natural and unalienable right.

The case finds that the plaintiff has an " abnormally sensitive

nature." This means that his nature is abnormal, irregular, exceptional, unnatural, or monstrous. See Rev. Samuel Fallow's Synonyms and Antonyms, "Normal," *p.* 179. We may fairly assume that if he were possessed of a normal, ordinary, sensible, and natural mind, the religious belief and methods of his wife would injure neither his health nor his reason.

The finding that "the causes above mentioned operated upon the abnormally sensitive nature of the plaintiff, and have seriously injured his health," must be considered in connection with the next paragraph (as well as the preceding pages), where it is also found that Mrs. Robinson, "in embracing and practising Christian Science, intended no injury to her husband or his business. She did not believe, and ought not reasonably to have anticipated, that her advocacy of the doctrine, or her practising as a doctor, would seriously injure his health, or seriously endanger his reason. She is sincere in her belief of the truthfulness of the doctrine." She comes before the court without any wilful or intentional wrong or misconduct, and without any moral fault or delinquency; and no court that we are aware of has ever granted a divorce where no intentional, wilful, or moral misconduct was proved. G. L., *c.* 182, *s.* 3, provides that a divorce for the causes named shall be decreed in favor of the innocent party. We have never understood that the court was authorized to grant a divorce against an innocent party.

The findings of the court show that Mrs. Robinson's belief and practice of Christian Science were not the real or direct cause which occasioned the plaintiff's alleged ill health. The plaintiff was " naturally proud, sensitive, and reasonably ambitious, besides being somewhat passionate and hasty," and frequent suggestions were made to him that his wife's practice as a Christian Scientist was injuring his business. The subject often became a matter of joke by the libellant's customers and acquaintances. Rumors in relation to a prosecution of Mrs. Robinson for malpractice in the case of Mrs. Jackman were circulated by Littleton doctors and busybodies. Some took pains to tell him that his wife had turned veterinary physician. She was the subject of ridicule on the part of the physicians of Littleton, who entertained unkind feelings towards her for interfering, as they regarded it, with their practice undoubtedly; and it is also true that the plaintiff did not believe in Christian Science, and had no sympathy with her advocacy or practice of its doctrines, but regarded it as foolishness and fanaticism, and was annoyed and irritated thereby. This tattle, idle gossip, and these false and unjust rumors operated upon his morbidly sensitive and irritable nature so that he became moody, morose, and reticent. The natural consequences follow, and he is sometimes troubled with insomnia, loss of appetite, and became generally despondent, discontented, and unhappy from brooding over his domestic relations. This condition of things was not the

direct, immediate, and natural effect of any acts of the defendant amounting to extreme cruelty, or of any treatment by Mrs. Robinson of her husband seriously to injure his health or endanger his reason.    In fact, no word or act of the defendant is shown by the case to have had any direct connection with or influence upon the libellant's ill health and mental depression.    His condition is shown to have been largely due to the natural state of the plaintiff's cranky and abnormal mind, stirred up and fretted as he was by his associates, more inclined to interfere with his and his wife's domestic affairs than to mind their own business.

It being found that the libellee did not know, and ought not reasonably to have anticipated, that her advocacy or practice as a doctor of Christian Science would seriously injure his health or reason, she certainly should not be held responsible for the evil talk of the evil spirits of Littleton, who may have attempted to stir up the naturally excitable mind of the plaintiff.

It is clear beyond dispute, as it seems to us, that the trouble in this case mainly arises from the meddlesome dispositions and the jealous rivalry of Littleton doctors and other Littleton gossipers, wrongfully and unjustifiably harping to the plaintiff about his wife's religious faith.    Had those meddlesome people let Mr. Robinson alone, as it was their duty to do, we never should have heard of this divorce case.

Such a condition of things as this case discloses never would have occurred in the domestic life of a chivalrous, high-minded, and affectionate husband, especially when it has been distinctly found by the court below that Mrs. Robinson's character "for kindness, tenderness, generosity, and peaceableness, as woman, wife, mother, and neighbor," is good, and that she possesses all these qualities.    Mrs. Sinclair and several other witnesses testified that Mrs. Robinson's reputation " in these respects was just as good as it could be."    Now, can the court for a moment believe that if Mr. Robinson had exhibited the same qualities towards his wife which she has shown by her daily walk and conversation among her neighbors and acquaintances for thirty-five years, we should ever have heard of this divorce case?

This case is one of novel impression.    Our statute gives fourteen distinct causes for divorce in favor of an innocent party.    The court ought to be slow in granting a divorce in any case, certainly slow about adding another cause to those prescribed by statute, or unnecessarily to enlarge the scope of the causes of divorce contained in the statute.

CARPENTER, J.    The act of February 17, 1791, declared that "divorces may be decreed for the cause of extreme cruelty in either of the parties."    Laws (ed. 1830) 157.    What constitutes extreme cruelty was left to be determined by the ecclesiastical common law.    " Mere austerity of temper, petulance of manners,

rudeness of language, a want of civil attention and accommodation, even occasional sallies of passion, if they do not threaten bodily harm, do not amount to legal cruelty; they are high moral offences in the marriage state undoubtedly, not innocent surely in any state of life, but still they are not that cruelty against which the law can relieve. Under such misconduct of either of the parties—for it may exist on the one side as well as on the other—the suffering party must bear in some degree the consequences of an injudicious connection; must subdue by decent resistance or by prudent conciliation; and if this cannot be done, both must suffer in silence. If it be complained that by this inactivity of the courts much injustice may be suffered and much misery produced, the answer is, that courts of justice do not pretend to furnish cures for all the miseries of human life; they redress or punish gross violations of duty, but they go no further: they cannot make men virtuous; and as the happiness of the world depends upon its virtue, there may be much unhappiness in it which human laws cannot undertake to remove.

"Still less is it cruelty when it wounds not the natural feelings, but the acquired feelings arising from particular rank and situation; for the court has no scale of sensibilities by which it can gauge the quantum of injury done and felt; and therefore, though the court will not absolutely exclude considerations of that sort where they are stated merely as matter of aggravation, yet they cannot constitute cruelty where it would not otherwise have existed. . . . The rule cited by Dr. Bever from Clarke and the other books of practice is a good general outline of the canon law, the law of this country, upon this subject. In the older cases of this sort which I have had an opportunity of looking into, I have observed that the danger of life, limb, or health is usually inserted as the ground upon which the court has proceeded to a separation. This doctrine has been repeatedly applied by the court in the cases that have been mentioned; the court has never been driven off this ground; it has been always jealous of the inconvenience of departing from it; and I have heard no one case cited in which the court has granted a divorce without proof given of a reasonable apprehension of bodily hurt. I say an apprehension, because assuredly the court is not to wait till the hurt is actually done; but the apprehension must be reasonable; it must not be an apprehension arising merely from an exquisite and diseased sensibility of mind. Petty vexations applied to such a constitution of mind may certainly in time wear out the animal machine, but still they are not cases of legal relief; people must relieve themselves as well as they can by prudent resistance,—by calling in the succours of religion and the consolations of friends; but the aid of courts is not to be resorted to in such cases with any effect." *Evans* v. *Evans*, 1 Hagg. Con. 35, 38–40 (decided in 1790). "There must be something which renders cohabitation unsafe; for there may be much unhap-

piness from unkind treatment and from violent and abusive language;—but the court will not interfere—it must leave parties to the correction of their own judgment; they must bear as well as they can the consequences of their own choice.    Words of menace are different: if they are likely to be carried into effect, the court is called on to prevent their being carried on to mischief."    *Harris* v. *Harris*, 2 Ph. Ecc. 111 (1813).    "To amount to cruelty, there must be personal violence or manifest danger of it; for unkindness, reproachful language on the one side, or vain and unfounded fear on the other, do not constitute any case of cruelty which the law can notice."    *Barlee* v. *Barlee*, 1 Add. Ecc. 301, 305 (1822).    "Legal cruelty is not established.    Quarrels, and, if implicit credit can be given to the witnesses on the libel, much improper language by the husband passed, but there was no conduct to excite in the wife any reasonable apprehension of danger to her person."    *Kenrick* v. *Kenrick*, 4 Hagg. Ecc. 114, 129 (1831).    "Where there is a strong conviction in the mind of the court that the personal safety of the wife is in jeopardy, or where even it may see reasonable ground to apprehend such consequence, it is its bounden duty to protect the wife from risk and danger. In these suits the species of facts most generally adduced are,—first, personal ill treatment, which is of different kinds, such as blows or bodily injury of any kind; secondly, threats of such a description as would reasonably excite in a mind of ordinary firmness a fear of personal injury.    For causes less stringent than these the court has no power to interfere and separate husband and wife. . . . Short of personal violence, or reasonable apprehension of it, I have no authority to interfere."    *Neeld* v. *Neeld*, 4 Hagg. Ecc. 263, 265, 271 (1831).    To constitute cruelty "there must be either actual violence committed, attended with danger to life, limb, or health; or there must be a reasonable apprehension of such violence.    This I apprehend to be the substance of the doctrine laid down in *Evans* v. *Evans*, . . . and in other subsequent cases."    *Lockwood* v. *Lockwood*, 2 Cur. Ecc. 281, 283 (1839).

In *Chesnutt* v. *Chesnutt*, 1 Spinks 196 (1854), one of the charges against the defendant was that " he used obscene and blasphemous language, was constantly intoxicated, and thereby occasioned his wife great mental suffering and bodily ill health."    The court (Dr. *Lushington*) say, *pp.* 188, 191,—" Here is no charge either of bodily violence inflicted, or of threats of personal ill treatment.    However disgusting the use of the language charged, if proved, may be—however degrading habits of intoxication—however annoying to a wife, especially the wife of a gentleman and a clergyman,—these facts standing alone do not constitute legal cruelty.    If it be said that the consequences to the wife are mental suffering and bodily ill health, I do not think that the case would be carried further.    The same might be said of other vices,—of gaming for instance; of gross extravagance, to the ruin of a wife

and family;—all these might occasion great mental suffering, and, consequent thereon, bodily ill health to the wife ; but they do not constitute legal cruelty. Such consequences, to be the subject of legal redress, must emanate from bodily ill treatment, or threats of the same. Such I apprehend to be the clear line of distinction drawn by all the authorities.  .  .  .  Mental anxiety, excitement, bodily illness, though occasioned to the wife by the conduct of the husband, do not constitute cruelty, except such conduct was accompanied with violence or threats of violence."

In *Barrere* v. *Barrere*, 4 Johns Ch. 187, 189 (1819), *Kent*, Ch., after reciting the facts, says.—" There can be no doubt that these acts of bodily violence and harm amount to that cruelty against which the law intended to relieve. Mere petulance and rudeness and sallies of passion might not be sufficient; but a series of acts of personal violence, or danger of life, limb, or health, have always been held sufficient ground for a separation by the canon law, which is the law of England upon this subject. Though a personal assault and battery, or a just apprehension of bodily hurt, may be ground for this species of divorce, yet it must be obvious to every man of reflection that much caution and discrimination ought to be used on this subject. The slightest assault or touch in anger would not surely in ordinary cases justify such a grave and momentous decision."

" The cruelty which entitles the injured party to a divorce consists in that kind of conduct which endangers the life or health of the complainant, and renders cohabitation unsafe. If the charges in this bill are true; if this defendant permits her passions so far to usurp the throne of reason as to allow her to  .  .  . commit personal violence upon her husband in his sleep,  .  .  . to threaten his destruction by poison and even to go so far as to procure a deadly drug for that purpose, not only his health, but even his life, is in actual danger from her violence." *Perry* v. *Perry*, 2 Paige 501–503 (1831). " It is true, that to constitute *sævitia* known to the civil law,  .  .  . it is not necessary there should be an infliction of bodily injury, or any act of personal violence committed. It is sufficient if there be a series of unkind treatment accompanied by words of menace creating a reasonable apprehension that bodily injury may result to the wife unless prevented.  .  .  . It [cruelty] must be actual personal violence, menaces or threats, creating reasonable apprehension of bodily harm." *Mason* v. *Mason*, 1 Edw. Ch. 278, 291, 292 (1832). The courts of Massachusetts held substantially the same doctrine. *Hill* v. *Hill*, 2 Mass. 150 (1806) ; *Warren* v. *Warren*, 3 Mass. 321 (1807) ; *French* v. *French*, 4 Mass. 587 (1808).

The question what constitutes extreme cruelty first came before this court in 1834, in *Harratt* v. *Harratt*, 7 N. H. 196. The evidence proved that the defendant had threatened to take the plaintiff's life, had treated her harshly and with neglect in sickness, and had

ceased to provide for her support; it also tended to show a reasonable apprehension that cohabitation might subject the plaintiff to disease. The court, *Parker*, J., after citing with approval *Warren* v. *Warren*, *Evans* v. *Evans*, and some of the other foregoing cases, say "That cruelty may be extreme without blows cannot be doubted; and we have no difficulty in holding that where the causes are grave and weighty, and such as to show an impossibility that the duties of the married life can be discharged—when violence is menaced, and there is reasonable apprehension of danger to life, limb, or health—the case comes within our statute, and that the court ought not to wait until the hurt is actually done. There has been more doubt whether the case before us, on the facts in evidence, comes clearly within the principle. The evidence, however, shows that the life of the libellant has been threatened, and we cannot say that there is no probability that violence will be resorted to; and as there is further evidence of harsh treatment and neglect, and of circumstances tending to show that cohabitation would be attended with danger to the health of the libellant, the court is of opinion that all these circumstances combined bring the case within the statute." In *Poor* v. *Poor*, 8 N. H. 307, 315, 316, decided in 1836, *Richardson*, C. J., says,—"What, then, is extreme cruelty? It is not mere austerity of temper, petulance of manners, rudeness of language, a want of civil attention, or even occasional sallies of temper, if there be no threat of bodily harm. . . . In the judgment of law, any wilful misconduct of the husband which endangers the life or health of the wife, which exposes her to bodily hazard and intolerable hardship and renders cohabitation unsafe, is extreme cruelty. And in order to amount to such cruelty it is not necessary that there should be many acts. Whenever force and violence, preceded by deliberate insult and abuse, have been once wantonly and without provocation used, the wife can hardly be considered safe."

To constitute extreme cruelty, direct bodily injury, actual or threatened, was essential. Threats of personal violence, unless of such a character as to create "in a mind of ordinary firmness" a reasonable apprehension that they might be executed, were not legal cruelty. To the exceptionally sensitive and timid wife, put in actual and constant fear of limb or life by conduct not calculated to have that effect on a person of normal and ordinary sensibility, the law of divorce afforded no relief. The infliction of mere mental pain, however seriously it might injure health or endanger reason, was not legal cruelty. A husband might violate all the proprieties and decencies of social life; he might call "his virtuous wife a strumpet, saying so not to herself alone, but before everybody," although "as far as suffering was concerned he had better kick her" (*Paterson* v. *Paterson*, 3 H. L. Ca. 308, 313); he might bring prostitutes into his family and seat them at his table,—make his house a brothel,—and the law, if it would justify the wife in

leaving him, afforded her no other remedy. For such conduct as that described in *W——* v. *W——*, 141 Mass. 495, and the injury caused to "her health by its effect upon her feelings," the wife was then, in New Hampshire, as she is now in Massachusetts, remediless. Constant, innumerable, and nameless indignities of speech and action, each possibly petty in itself, might cause mental anguish less endurable, more hurtful to physical well-being, and more likely to overturn reason, than any degree of pain produced by blows; they might make life intolerable and death welcome, yet they were not legal cruelty. The sufferer's only remedy was "by prudent resistance," and "by calling in the succours of religion and the consolations of friends."

In consideration of this state of the law, the legislature, in 1840, enacted that "divorces . . . shall be decreed in favor of the innocent party . . . when either party shall so treat the other as seriously to injure health or endanger reason." Laws 1840, *c.* 573, *s.* 1. This provision in substantially the same language has ever since remained in force. Rev. Stats., *c.* 148, *s.* 3. In the revision of 1867 it was verbally modified to read as follows: "A divorce . . . shall be decreed . . . V. When either party has so treated the other as seriously to injure health. VI. When either party has so treated the other as seriously to endanger reason. Gen. Stats., *c.* 163, *s.* 3; G. L., *c.* 182, *s.* 3. The provision is to be construed in view of the mischief it sought to cure. It was intended to provide for a divorce of the parties in cases of the character referred to, where the conduct complained of did not fall within the established definition of extreme cruelty. It gave by legislation the relief which the English courts, pressed by the weight of the same considerations, have gone far to afford (*Paterson* v. *Paterson*, 3 H. L. Ca. 308, 318, 319, 325–329 (1849), *Kelly* v. *Kelly*, L. R. 2 P. & D. 31 (1869), *Mytton* v. *Mytton*, 11 P. D. 141 (1886), and Bish. Mar. & Div. (4th ed.) *s.* 722 *n.*), and which the courts of some jurisdictions under like pressure have afforded by a more liberal interpretation of the term "cruelty." *Butler* v. *Butler*, 1 Par. Eq. Cas. 329; *Powelson* v. *Powelson*, 22 Cal. 358; *Latham* v. *Latham*, 30 Grat. 307; *Cole* v. *Cole*, 23 Iowa 433; *Gholston* v. *Gholston*, 31 Ga. 625; *Palmer* v. *Palmer*, 45 Mich. 150; *Carpenter* v. *Carpenter*, 30 Kans. 712; *McMahan* v. *McMahan*, 9 Or. 525; *Kelly* v. *Kelly*, 18 Nev. 49; *Jones* v. *Jones*, 60 Tex. 460.

Whether one party has been so treated by the other as seriously to injure health or endanger reason is a pure question of fact. It cannot be declared as matter of law that any particular treatment may not have that effect. The gist of these causes of divorce is the injury to health and the danger to reason. Conduct which to a serious extent produces either, though not intended to have such a result,—though it be "purely self-regarding," and not "directed towards" or "forced even upon the knowledge of" the other party "otherwise than by the usual intimacy of matrimony" (*W——*

v. W——, 141 Mass. 495, 496),—is a cause of divorce. Any behavior of one party which affects the other physically or mentally is treatment within the meaning of the statute. A narrower sense cannot be given to the language used without ignoring the extent of the evil to be cured, and depriving a large proportion of those who suffer from it of the protection the legislature intended to provide for them. The purpose of the legislature was to make the remedy co-extensive with the mischief. A malevolent motive in the party complained of need not be shown. Divorce is not punishment of the offender, but relief to the sufferer. Whether the behavior proved is a sufficient ground of divorce depends on the question whether it has seriously injured health or endangered reason. This is the sole test. The question is, not whether the treatment reasonably ought, or could reasonably be expected, seriously to injure the health or endanger the reason of a person of ordinary intelligence and mental strength, but whether it has in fact had that effect upon the health or reason of the person complaining. A course of conduct which would drive one person crazy, might have no effect on, or might even be grateful to, another and perhaps more sensible or less sensitive person; but he or she whose reason is imperilled by it is not therefore to be compelled to endure the treatment. That the conduct complained of is in itself innocent, or even laudable, and is pursued from a sense of duty, does not afford a sufficient reason for requiring the party injured by it to submit to the destruction of health, reason, and life. The abstract reasonableness of the treatment, or its effect upon reasonable persons of ordinary firmness, does not enter into the question. If it did, the redress intended by the statute could not in many cases be obtained. The provision was designed for the benefit of the sensitive—not excepting the abnormally sensitive—and not for the insensible and apathetic, whom nothing but blows can affect. It was intended to reach and provide relief in a class of cases where extreme cruelty as defined by law cannot be established—cases, among others, of slow and continuous mental torture, destructive of health or reason, and caused by conduct not necessarily wrongful, possibly even praiseworthy, in itself, and made a cause of divorce only because of its effect upon an abnormally sensitive mind.

The injury, and in greater part the suffering, caused by acts tending to the destruction of health or reason may not depend upon the intention with which they are done. Whether they are done with or without malice, they may be in their effect equally hurtful and destructive. In the judgment of the legislature, it is better that the marital relation be dissolved, than that by its continuance the health or reason of either party be destroyed. Whether the legislation is wise or unwise is a question upon which opinions may differ; but with it the court has no concern. Its duty is to enforce the law as it is found to be. To hold that to warrant a divorce

treatment seriously endangering health or reason must be wilful, malicious, or malevolent would repeal the statute.

It is found that the defendant's conduct has seriously injured the plaintiff's health, and the court cannot say that the finding is not warranted by the evidence.   *Jones* v. *Jones*, 62 N. H. 463, 467.

*Divorce decreed.*

SMITH, J., did not sit: the others concurred.