EFFIE M. CARLISLE, Appellant, v. C. H. CARLISLE.

**Divorce:** EVIDENCE: *Cruel treatment.*  In an action by a wife for a divorce, there was evidence that defendant was ill-tempered, and once threatened to kick her out of the house.  He testified that there was a bad woman at his house and he told his wife that, if she was going to harbor that dirty thing there, he would kick them both into the road.  Plaintiff testified that he threatened three different times to kick her into the road, but there was no evidence that he ever attempted to do so, or did any violence to her person. *Held,* insufficient to entitle her to a divorce on the ground of cruel and inhuman treatment.

EVIDENCE: *Adultery.*  In an action against C. for divorce, a witness testified that she had seen plaintiff act very unbecomingly with other men; that "I have seen her lie on a bed with another man, with his arms around her.   I have known the same man to spend a half a day at a time at her house, when C. wasn't at home, day after day."   The testimony was taken on written interrogatories and plaintiff failed to cross-examine.  *Held,* insufficient to show adultery by plaintiff.

*Same.*  Evidence held insufficient to establish adultery.  It is held that the husband should not regain title to the homestead which he had placed in the wife; and an attorney fee is allowed her for defense to cross-bill.

*Appeal from Carroll District Court.*—HON. GEORGE W. PAINE, Judge.

FRIDAY, OCTOBER 16, 1896.

PLAINTIFF petitions to be divorced from the defendant, on the ground of inhuman treatment, such as to endanger her life. She also asks the custody of their two minor children. The defendant answered, denying the charge of inhuman treatment, and, by way of cross-petition, alleges that the plaintiff was guilty of adultery; wherefore, he asks for a divorce and for the custody of said children. He further alleges that there is now standing in the name of the plaintiff the legal title to lots 2 and 3, in block 1, of Gardner's Fourth addition to the town of Manning, Carroll county, Iowa; that defendant is the real owner of said property, the same being acquired with money bequeathed to him from his father's estate; that the plaintiff has abandoned said property, which is the homestead of these parties; and that the defendant is still using the same as his homestead. He asks that it be decreed that said real property be and forever remain the property of this defendant, and "that he be awarded the same as alimony." Plaintiff replied, admitting that the title to said property is in her name, and denying every other allegation in said cross-petition. She prays that said property may be quieted in her as against the defendant, and for decree as asked in her petition. The case was submitted, and a decree entered dismissing the plaintiff's petition, and granting a divorce and custody of the children to the defendant on his cross-petition; and it was further ordered and decreed that the title to said lots be transferred to and vested in the defendant, and the defendant pay the costs of this action, and that he pay to plaintiff's attorneys one hundred dollars for their fees in making defense to said cross-bill, and that the same be a lien on said lots, and that general execution issue for the costs and special execution for said attorney's fee. The plaintiff appeals generally, and the defendant

appeals from so much of said decree as ordered that defendant should pay the costs and said attorney's fee, and as makes the judgment for said fee a lien on said real estate.—*Reversed.*

*M. W. Beach* and *Douglas Rogers* for plaintiff.

*B. I. Salinger* for defendant.

GIVEN, J.—I. We first inquire as to plaintiff's alleged cause for a divorce. She alleges that since their marriage, in 1878, the defendant became cross and abusive to her, and at various times accused her of being unchaste, and threatened to kill her; also, that he neglected to provide for and support her. The evidence shows that the defendant is ill-tempered, of a jealous disposition, and frequently, upon slight provocation, used vile, profane, and abusive language towards his wife, and on one occasion at least, threatened to kick her out of the house. He testifies: "There was a bad woman at my house, and I stated to her that, if she was going to harbor that dirty thing there, I would kick her and the woman both into the road, and stamp them when I got them there. It was last fall." Plaintiff testifies that he threatened to kick her into the road three different times, but there is no evidence that he ever attempted to carry his threats into execution, or did any violence to the person of plaintiff. As to the charge of neglecting to provide for his wife, it does not appear but that defendant provided as amply as men of his means usually do. To constitute a cause for divorce, the treatment must not only be inhuman, but must be such as to endanger life. *Freerking v. Freerking,* 19 Iowa, 34. It must be such as to justify a belief that the continuance of cohabitation would be dangerous to her life and health. *Vanduzer v. Vanduzer,* 70

Iowa, 614 (31 N. W. Rep. 956); and must not be such
as is caused by the party's own misconduct. *Knight
v. Knight,* 31 Iowa, 451. Reprehensible as defendant's
treatment of his wife was, we do not think it was
without fault on her part, nor such as to endanger her
life or health. The plaintiff's bill was properly dis-
missed.

II.   We next inquire as to the defendant's cause
of action. He alleges as a cause for divorce that while
residing in Benton county, "some seven years ago, the
plaintiff, in violation of her marriage vows, committed
the crime of adultery with a man at this time to the
defendant unknown; that, since the removal of the
parties to this county, the plaintiff did, at Manning,
Iowa, commit the crime of adultery with one Foster,
living at or near the town of Gray, Iowa, and with one
Oscar Hunter, now living near Manning."

The evidence relied upon to support the charge
of adultery prior to the removal of the parties to Car-
roll county is, in substance, as follows: Hugh McNulty,
a brother-in-law of the defendant, testifies in
his deposition that Mrs. Carlisle was very indis-
creet in her actions in Tama; that, during the
absence of his wife, she was at his house, doing work.
He says: "One morning I just shoved open her door,
and I saw Lee on the bed. I told them that breakfast
was ready. He was kissing her, and laying on top of
the bedclothes, and she was in bed yet. I can't think
of this man's first name. His other name was Lee.
She was not dressed yet." He also testifies that at
one time he went to Carlisle's house one night, when
Carlisle was sick in bed; that he asked Mrs. Carlisle
where Lee was, and she told him he had gone to his
place. "I looked around, and there he stood in the
room." Witness says: "I told him that was not the
way, if he was going to take care of Collin, who was
pretty sick, I would send another man down." He

also states: "I saw her at the Toledo House, probably three years ago, after they went to Manning. There was a man with her. I don't know who it was. It was not her husband. It was about eight o'clock in the morning. * * * I never told Mr. Carlisle about discovering Lee in his wife's bedroom." Mary Urmy, a sister of the defendant, whom she calls her "favorite brother," testifies in her deposition to being at the home of these parties, near Dysart, at a time when both of them were confined to bed by sickness, and that she remained three nights, and slept in the back part of the bed occupied by the plaintiff. She testifies that Art Campbell placed chairs alongside of plaintiff's bed, and placed quilts thereon, so as to be even with the bed, and slept there. She says: "He had intercourse with her three nights, me laying there in bed. * * * She supposed I was sleeping and Mr. Campbell nestled over her bosom. I suppose four or five times during each night; and she would raise up, and have her face over my face, to see if I was asleep, just before the intercourse." She says she did not cry out. "Didn't do a thing. I did not tell my brother. I wrote a letter. I suppose the lawyer has it." She also states that they knew she was there; that they talked together, but did not speak to her.

A Mrs. Kerr testified that she observed the conduct of the plaintiff, with Lon Lawyer and Art Campbell, and that her manner and speech with these two men was very free. and inclined to familiarity. She states that she was at Carlisle's home a few times when they were both sick, in the fall of 1891, and that Campbell was very free and familiar in conversation with Mrs. Carlisle. She also states, that at one time Lawyer was at her house when the plaintiff passed and he invited her to ride home with him, which invitation she accepted, and that it required him to go a mile out of his way to take her

home. A Mrs. Bates testifies, that she has seen the plaintiff act very unbecomingly with other men. "I have seen her lie on a bed with another man, with his arms around her. I have known the same man to spend half a day at a time at her house, when Mr. Carlisle wasn't at home, day after day." The defendant offered in evidence what purports to be a letter, bearing date, February 24, 1893. It is without signature, and is not addressed to any person. The evidence fails to show, that it is the writing of plaintiff, or that it was from her, or that she had any knowledge of it. Therefore, it is not entitled to consideration. The evidence relied upon as establishing the alleged adultery with Foster and Hunter is, in substance, as follows: Mrs. Peters testifies that she was at the Carlisle home one evening last summer, from eight to nine o'clock; that Mrs. Carlisle was in her night dress; that the doors were open; that a man knocked at the back door, and that Mrs. Carlisle went to the door in her night dress, and that she went out at the front door, and did not hear a word spoken or know the man. She says the screen doors were closed; that it was a warm evening; that, when she went there, Mrs. Carlisle came from the bedroom, and that she does not know where Mr. Carlisle was; that he might have been in the bedroom. Mrs. Jensen testifies that on the fourth of July she saw plaintiff with George Daily on the fair grounds; that they walked right back of her; and that she heard Daily say to plaintiff, "I guess the old lady is watching us," and she said, "Yes, and the old man is, too," and he said, "What makes you think so? What reason do you have to think so?" and she said, "I suppose she saw us the other evening when we met down there;" and she was a little anxious about it, and he says, "Well, we have to take what sweets there is in this life along with the rest." Witness says there were lots of other men and women walking

on the fair grounds, but that she does not remember seeing Mr. Carlisle. Mr. Burdick testifies that he saw Captain Foster and Mrs. Carlisle in his store together once or twice; that Foster was buying some groceries, and gave Mrs. Carlisle some of them,—some kind of canned fruit. "I don't think it was fresh peaches. My recollection is that he gave her a can of canned peaches. I am not positive. I know he gave her something."

The plaintiff, in her testimony, denies the statements made by McNulty, and says that while working for him, during the absence of his wife, she was doing the housework for Mrs. McNulty; that she did it herself, including the breakfasts. She says that Mr. Carlisle slept in the same room with her all the time she was at McNulty's. She admits being in Toledo three years ago, in September preceding the trial, with her father. While these denials must be weighed in the light of the plaintiff's interests, we may not overlook the apparent fact that Mr. McNulty is quite strongly prejudiced in favor of his brother-in-law, the defendant, and that, if the plaintiff prepared the breakfast, as she says, without contradiction, that she did, Mr. McNulty would not be at her room before she was up, to tell her that the breakfast was ready. We think, under the law, we would not be warranted in finding from the testimony of McNulty, that the plaintiff was guilty of adultery with Lee.

If the evidence of Mary Urmy may be accepted as true, it, unquestionably, shows plaintiff guilty of adultery with Arthur Campbell; but there is much in the record to challenge the truthfulness of her statements. This witness is evidently strongly prejudiced in favor of her "favorite brother," and against the plaintiff. In the light of undisputed facts, her statements seem to be highly improbable. The house was sixteen by twenty-four feet, divided into a bed room, pantry, and living room, the bed room

and pantry being each eight by eight, and the living room sixteen by sixteen. There were two beds in the living room, one occupied by the defendant, the other by the plaintiff's sister and some children. The one bed in the bed room was occupied by the plaintiff, her little girl, and Mrs. Urmy, the door between these rooms being open. Some time prior to Mrs. Urmy's visit, the plaintiff and the defendant's brother, George, had a quarrel, and George kicked and abused the plaintiff, so as to bring on some form of female trouble, which was the cause of her sickness. Mrs. Urmy says: "She was sick and lay in bed six or seven weeks, and was very sick. She complained of womb trouble. This clinching brought back female trouble. I don't know if the womb was dropped down out of place. She told me she just had weakness." Mrs. Urmy says that Mr. Carlisle took it so hard about her being hurt by his brother that it made him sick. "It kind of hurt his mind." Art Campbell and Lee Perry, a brother of the plaintiff, were there, taking care of the sick. Campbell attended through the day, and Perry at night. Plaintiff's sister was doing the work. During the stay of Mrs. Urmy, the light was kept burning in the living room all night, and lighted up the bed room to some extent through the open door. Lee Perry stayed up each night with the defendant, and gave him medicines about every half hour. He testified that the acts stated by Mrs. Urmy could not have occurred without his knowing it, and that nothing of the kind did occur. The deposition of Arthur Campbell was taken, in which he testified that the general moral character of the plaintiff was good. It is urged as a corroboration of Mrs. Urmy's testimony that Campbell did not contradict her statement as to the conduct between him and the plaintiff. It does not appear when the depositions of these two witnesses

were taken, nor whether the plaintiff had opportunity
to examine Campbell on the subject after Mrs. Urmy's
deposition was taken. And Art Campbell was exam-
ined on the trial as to the handwriting of the letter
referred to, but whether or not this was the same
Campbell does not appear. The testimony of Mrs.
Urmy as to the adulterous conduct, viewed in the
light of the improbability of her story, because of the
surroundings and the condition of her health, and of
witness' prejudice, does not seem to us to be entitled
to credit. The familiarity of "manner and speech
with Art Campbell," spoken of by Mrs. Kerr, is
explained, we think, by the fact that Campbell was
there in attendance upon plaintiff's sick husband.
There was surely nothing in such familiarity to
warrant a conclusion of improper conduct, nor
as constituting a substantial corroboration of Mrs.
Urmy. Neither does the fact that plaintiff, upon invi-
tation, rode to her home with Lawyer, afford any
ground for suspicion, even if he did travel a mile
out of his way to accommodate her. The testi-
mony of Mr. Bates is uncontradicted and unex-
plained, and, in our opinion, is the only evidence upon
which the plaintiff, may at all, be found guilty of adul-
tery. The testimony of Mrs. Peters, Mrs. Jensen, and
Mrs. Burdick does not warrant such a conclusion. That
Mrs. Carlisle, seated in her own house, upon a warm
summer night, in her night dress, with no lights burn-
ing, as she says, should have gone, without dressing,
to her door, to answer a call, is certainly not ground
for believing her guilty of adultery, nor is the conver-
sation which Mrs. Jensen says she overheard between
plaintiff and Daily on the fair grounds. Plaintiff and
Daily both deny having had this conversation, but
concede that it was had, it would not be sufficient
ground for finding adultery. Capt. Foster testifies that
in Burdick's store he bought ten cents' worth of fresh

peaches, and gave the plaintiff one or two; and this fact is the only one proven to support the direct charge of adultery with Foster, while as to Hunter there is entire absence of any evidence.

Evidence of adultery is sufficient when the circumstances proven lead naturally and fairly to the conclusion of guilt, and are inconsistent with any theory of innocence. *Names v. Names*, 67 Iowa, 383 (25 N. W. Rep. 671). We see nothing in the testimony, other than that of Mrs. Bates, which leads to the conclusion of guilt. All that Mrs. Bates stated on cross-examination is that "I have said about all I know about the matter. My answers are from my personal knowledge." Her testimony was taken in the form of a deposition, and there seems to have been no cross-examination as to the matters testified to by her. · We· presume from the absence of cross-examination that the deposition was taken upon written interrogatories, and that plaintiff's counsel, not knowing to what she would testify, did not put any cross-interrogatories on that subject about which she did testify. Taking the testimony of Mrs. Bates, unexplained and uncontradicted as it is, and much as it tends to reflect upon the character and conduct of the plaintiff, we do not think that the matters stated are inconsistent with the presumption of innocence of adultery that we must hold to exist. We are left to conjecture who the man was, why this familiarity, and why he was at the home of the plaintiff as stated, and to say therefrom that plaintiff was guilty of adultery. This we cannot do, because, for aught that appears, this conduct may be entirely consistent with innocence.

Our examination of the record leads to the conclusion that the petition of the plaintiff was properly dismissed, and that the cross-petition of the defendant should also be dismissed; as to the real estate in question, the title should be left where the parties

placed it; that each party should pay the costs arising upon his or her action; and that the defendant should pay to plaintiff's counsel, for defending against his cross-bill, an attorney's fee of one hundred dollars. The case will be remanded to the district court, for decree in conformity with this opinion.—REVERSED.