WILLIAM PFANNEBECKER v. MARGARET PFANNEBECKER,
Appellant.

**Divorce:** DESERTION. A cessation of intercourse alone will not
1 authorize a divorce; there must be an abandonment of all mar-
ital duties and complete separation to constitute desertion
under the statute.

**Same:** EVIDENCE. The evidence in an action for divorce, on the
2 ground that the wife declined to indulge in marital intercourse,
is reviewed and held to show such a condition of health as to
justify her in so doing.

**Cruel and inhuman treatment:** EVIDENCE. Evidence reviewed and
3 held insufficient to show such cruel and inhuman treatment of
the husband as to entitle him to a divorce on that ground.

*Appeal from Keokuk District Court.*— HON. JOHN T.
SCOTT, Judge.

FRIDAY, FEBRUARY 15, 1907.

ACTION for divorce on the grounds of cruelty and de-
sertion. Decree was granted as prayed. The defendant
appeals.— *Reversed.*

*W. C. Gambell* and *C. M. Brown,* for appellant.

*F. L. Goeldner, W. F. Wagner* and *Stockman & Ham-
ilton,* for appellee.

LADD, J.— The parties hereto were married September
2, 1891, and lived together happily until July, 1897. One
child, Grace, was born in 1896, and the other, Malcolm, in
1898. This action was begun in September, 1905, and re-
sulted in a decree of divorce in favor of the husband with
the custody of both children and the exclusion of the wife
from the home with a monthly stipend for support money.
The relief granted was based on two grounds: (1) That

the wife had wilfully deserted her husband by declining to have sexual intercourse with him for a period of two years; and (2) that she had been guilty of cruel and inhuman treatment such as to endanger his life. These will be considered in the order mentioned.

I.   The parties continued to live in the same house and slept in adjoining rooms up to the time the action was begun. She denied cessation of intercourse prior to April, 1905, while he testified this had not occurred since April, 1903. Every opportunity was afforded as they continued to have free access each to the bedroom of the other. Indeed, his testimony is utterly without corroboration, save in her aversion thereto, owing to causes hereinafter mentioned, and the testimony of a neighbor that defendant had told her that she did not desire any more children and had locked her door since Malcolm was born as the safest preventive. Even if she said this, the parties are agreed that it was not so. The situation illustrates the difficulties involved in such proof were denial of sexual indulgence alone to be regarded as a ground of divorce. The language of our statute precludes us from so holding, were we inclined, and we are not, for a divorce is authorized on this ground only " when he willfully deserts the wife and absents himself without reasonable cause for the space of two years." Section 3174, Code. This statute is equally applicable where the wife deserts the husband. It is not sufficient that one duty or that all save one be neglected. There must be a complete separation of the parties by the one absenting himself or herself from the other. The ecclesiastical courts which formerly exercised jurisdiction in matrimonial cases in England did not sever the ties of marriage on the ground of desertion, but undertook the restoration of conjugal rights only. In so doing distinction was made between marital cohabitation and sexual intercourse; the courts going no farther than to restore the former. The remedy for desertion in this country is divorce, but to con-

1. DIVORCE:
desertion.

stitute desertion it would seem that that must be lost which the ecclesiastical courts were able by their decrees to restore, namely, marital cohabitation, and such is the voice of the great weight of authority. *Fritz v. Fritz,* 138 Ill. 436 (28 N. E. 1058, 14 L. R. A. 685, 32 Am. St. Rep. 156) ; *Segelbaum₁ v. Segelbaum,* 39 Minn. 258 (39 N. W. 492) ; *Schoessow v. Schoessow,* 83 Wis. 553 (53 N. W. 856) ; *Throckmorton v. Throckmorton,* 86 Va. 768 (11 S. E. 289) ; *Steele v. Steele,* 1 McArthur (D. C.), 505 ; *Anonymous,* 52 N. J. Eq. 349 (28 Atl. 467). See, also, *Stewart v. Stewart,* 78 Me. 548 (7 Atl. 473, 57 Am. Rep. 822) and *Southwick v. Southwick,* 97 Mass. 327 (93 Am. Dec. 95), where it is held not to constitute "utter desertion." 14 Cyc. 612. There are respectable authorities to the contrary, but construing statutes essentially differing from that of this State. See *Fink v. Fink,* 137 Cal. 559 (70 Pac. 628) ; *Whitfield v. Whitfield,* 89 Ga. 471 (15 S. E. 543) ; *Evans v. Evans,* 93 Ky. 510 (20 S. W. 605). These decisions seem to have been unduly influenced by the opinion expressed by Mr. Bishop in his work on Marriage and Divorce, sections 778, 779, and which has not been followed by the better considered cases. In none had a statute expressly making the absenting of the spouse essential to constitute desertion been so construed, and which, as we think, leaves no escape from the conclusion that cohabitation as well as marital intercourse must be abandoned to constitute such desertion as will entitle the unoffending spouse to a decree.

II. There is another reason in this case for denying a divorce on the ground of desertion. This, to support the decree, must have been without reasonable cause, and, if it were to be conceded that the wife declined to indulge the plaintiff's passions, her physical condition was such as to justify her in so doing. In giving birth to the first child the neck of her womb was lacerated, and, although this may have been repaired, as testified by plaintiff, it is reasonably certain that it was not restored

2. SAME: evidence.

to its normal condition. She testified to a discharge ever thereafter, and that intercourse often was painful and followed by hemorrhage. He admitted that she sometimes complained of suffering pain. This to one not skilled in medicine would plainly indicate a condition requiring further repair, but plaintiff though saying he examined the parts, discovered nothing wrong. She denied that any examination was made and is strongly corroborated by the circumstances. After the birth of the second child she became exceedingly adverse to intercourse, and the cause was not discovered until examination by Dr. Oliver, September 21 or 22, 1905. He testified:

Found the neck of the womb torn and very tender, with a patch of granulations about the size of a five-cent piece, the right upper prolapsus tender and enlarged, and she complained of pain in her right side, just below and anterior to the right shoulder, to the front of the shoulder, and also on the right side of the neck. Her pulse was 72. That was the side where the breast was removed. Her temperature was 98, and she was quite nervous. I said ' torn '; it means the same as laceration. The trouble probably continued from one of her confinements, which one I could not say. The ulcer occupied a space of the mouth of the womb about the size of a five-cent piece. The mouth or whole cervix is about as large as a 25-cent piece. The cervix means the lower end of the womb. There was some discharge from the ulcer. The birth of a child is the commonest thing to cause laceration. It could be caused by other causes. It could be caused by manual disturbance, or sometimes caused by delivering a large tumor. The symptoms which usually accompany laceration of the womb are tenderness, the lips of the cervix all worked out, making it tender, with a discharge, with granulations or inflammation. I would expect that coition would be painful in defendant's case. It was tender over the right ovary. That tenderness might have been produced by some slight inflammatory action. It probably followed from the laceration of the womb. The inflammation of the ovaries frequently happens from lacerations. The majority of patients are nervous and get more

nervous the longer standing the case is.   If long continued,
it will seriously affect the health of the patient.   The pa-
tient is inclined to be irritable.   I think it has affected the
defendant both in a nervous and in a physical way.   Some
patients have desire for sexual intercourse, and some do not.
The longer these troubles are allowed to run the more effect
they have on the nervous system.

Cross-examination:   " I should think that intercourse
would be painful under the conditions I found existing in
this case.   I think it would cause aversion to intercourse.
I would not expect patients to solicit intercourse, nor advise
them to have it.   .   .   ."

Re-direct examination:   " Under the condition I found
existing, blood would sometimes follow the act of inter-
course."   This evidence is undisputed, save by the plaintiff's
claim that he had examined defendant and discovered noth-
ing of the kind, to which, as previously intimated, in view
of what has been mentioned and Dr. Oliver's testimony, we
are not inclined to give credence.   A more reasonable ex-
planation is that the defendant, becoming engrossed in the
practice of his profession and money getting and wearied by
the complaints and fault-finding of her whom he had prom-
ised to cherish in sickness as well as in health, neglected to
give her ailments the care and attention her condition de-
manded, and as a consequence much that he now complains
of happened.   To what has been said should be added the
fact that she underwent a surgical operation in the removal
of a breast in January, 1894, and we have a very satisfac-
tory showing of a reasonable cause for declining conjugal
intercourse.

III.   While defendant's physical condition cannot ex-
cuse her for extreme cruelty, it is proper that it should be
taken into consideration in weighing her conduct.   The
3. CRUEL AND        plaintiff has gathered the disagreeable things
   INHUMAN
   TREATMENT:        in their married life since 1897 and recited
   evidence.
them in detail.   They exhibit his wife as an extremely jeal-

ous and somewhat selfish individual. From the fact that all went well with them prior to this time it may be inferred that her physical difficulty in gratifying her husband may have influenced her suspicions of his infidelity. She conceded at the trial that these were without foundation, but not that her accusations were insincere at the time of making them. Moreover, the record plainly indicates that she is a somewhat eccentric woman, and of her peculiarities in this respect the plaintiff is not in a situation to complain. He took her as she was, for better or for worse. With the further observation that there was no proof of physical violence, actual or threatened, and that reliance for relief necessarily rests upon the prospective effect of defendant's somewhat persistent nagging and accusation of infidelity upon plaintiff's health, we may advert as briefly as may be to the main charges lodged against her, as bearing upon the two inquiries: (1) Whether these were cruel; and, if so, (2) whether the life of plaintiff was endangered thereby.

In July or August, 1897, upon her invitation a young lady friend visited her, accompanied by a baby sister. The child was taken sick with scarlet fever. Defendant demanded her immediate removal from the house. The plaintiff isolated her with the sister and her mother, who came to care for the child, in an upper room and treated her until she had recovered. The evidence is in conflict as to whether she declined to furnish food for them or they refused to receive it, and she objected to the neighbors bringing eatables. Certain it is that she accused her husband of being unduly intimate with the young woman, and when the latter departed told her never to return to her house again. At a later date she objected to him treating a woman some 55 years old because not responsible, with the intimation that their relations were improper, and in 1903, owing to her objection that he was " too thick " with the woman's daughter he was compelled to give up an engagement to assist in an operation on the latter. In 1898 he claimed, and she de-

nied, that she accused him of being unduly intimate with a trained nurse who had cared for her in confinement, and upon his report that his sister had given birth to another child he says she denounced his brother-in-law as a bull, while she attributes worse language to him. When he returned from his office late, she would inquire what woman he had been entertaining there. When the children were sick in 1902, she objected to plaintiff entering Malcolm's room while the nurse was there. He claimed, and she denied, that she frequently inquired of the children who were at his office. She criticised a couple of ladies for stopping in his office while waiting for the lodge on the floor above to open, and said if she had known to whom a plant, left in his office until it should be called for, belonged, she would have thrown salt on it. On one occasion, upon his return from a medical meeting, she denounced doctors as butchers and cut-throats. He claimed, and she denied, that she repeatedly referred to woman patients of good repute as " dirty things," and like designations, and declared that, if he could not make a living without working for them, he ought to go and shoot himself. After the operation in 1904 she said little or nothing to him for several months; would often leave the room when he entered. She had told the children that she would not attend the World's Fair at St. Louis, but upon discovering that her husband, in taking them, would be accompanied by two other families, changed her mind 24 hours before starting and went. He took a seat with other ladies of the company, and upon falling asleep his hat fell in the lap of a widow, who held it. Defendant noticed this and chided him. Upon reaching St. Louis she concluded that she was unable to be on her feet long enough to go over the fair grounds, and on the second day departed for a visit with her mother at Centralia. She requested plaintiff to stop for her on his way home, which he did, and found that she had left the day before. She explained this by saying that her mother was called to the deathbed of another

daughter, and she did not wish to remain after her departure. Later she accused plaintiff of having paid the expenses of the widow to the fair. She insisted that the women who were his patients wore their best dresses on the streets to show off, and that they ought to be at home attending to their families. At other times she declared that but for their sexual excesses they would not need treatment. She denounced his employés as immoral, and found fault with a tenant's character, saying, as he testified, that she hoped that the building " would go up in smoke." Undoubtedly she regretted her second pregnancy. But what he claims she said, which she denied, does not indicate that she did more than give an intimation of the desirability of an abortion. The record fails to show a purpose to have an abortion committed. He testified that she persisted in talking to him of these matters far into the night; that, when he would express the desire to go to sleep, she would say, " You've got to take it; you can't go to sleep, you have got to hear what I am going to say." She denies all this, but admitted going to his room freely when he had retired, but claims never to have remained after he expressed a desire to go to sleep. Plaintiff also related that at one time when Malcolm was putting on his gown she said, " I hope Malcolm will never need another gown "; that in the following morning, upon inquiry as to her meaning, she explained " that there is nothing in this world for him." Shortly after this she said to plaintiff in a conversation that she could kill him, and later, after he had retired and she had been in his room talking and he had fallen asleep, she returned, when he heard a noise, awakening him with a start. He immediately turned on the light and saw her standing about two feet from the door, and asked, " What do you want ? " To which she responded, " You don't need to be afraid; I won't hurt you." This, according to plaintiff, greatly shocked him. The defendant did not recall the circumstance of entering his room, and satisfactorily explained

the other incident. She discouraged him in his profession and sought him to abandon it. She objected to his absence from her more especially when sick. Plaintiff repeatedly warned his wife that, if she persisted in her accusations, it would be impossible for him to live with her. At first she asked forgiveness, and did better for a time. Upon their return from the World's Fair he testified she declared that, if he was going to get a divorce, she would do something that would ruin his practice, while she insists that she merely suggested a separation without a divorce. According to the doctor he never talked back save to answer her questions.

Enough has been said to indicate the character of defendant's treatment, without adverting to her insinuations as to some of his patients, her alleged neglect in preparing meals for him, her insistency that he obtain meals nowhere else, and possibly some other matters. The plaintiff's evidence was somewhat corroborated by the testimony of his sister that defendant had said to her that she used to think she could not see the children get sick and die without their father, but could now, and that she thought he was running after other women, and that if he was and some one shot him, she would not shed a tear; by that of Mrs. Kracht, who in cautioning children in front of the house not to throw water from the hose into the road, as this would scare her horse, had said to them, if they did, she would tell their father, whereupon defendant said, " You will tell his papa, will you? He will soothe all your trouble for you "; by that of Mrs. Wagner that she did not want more children, and therefore locked her door as the best prevention, and advised her to do the same, and that she had heard her say as much to another, that she thought the doctor unduly intimate with other women, and aimed to be at his office Wednesday and Saturday afternoons, as there were certain ladies she desired to watch, that he did not do as much as he could in treating the witness and others, and that she

thought the profession unclean (this witness says she often thought defendant's mind not right) ; by that of Gus Kratch that she arranged a meeting with him at the office and inquired if plaintiff had paid the expenses of the widow to the World's Fair; by that of Mrs. Moore that, when the neighbors brought eatables when the child was sick with scarlet fever, she ordered them away, and that she prepared an article for publication concerning that case, and that she heard the remark to Mrs. Kracht; by that of Eva Fish, who worked for her eight months, that she expressed a wish the doctor would give up his practice, and that a certain young lady would stay away from his office, but that she did not hear her criticise him otherwise; by that of Neuman that plaintiff had grown pale and more forgetful and thinner in the last few years. It will be noted that the only material corroboration of plaintiff's testimony is of the accusations of infidelity to his marriage relations. His claim that she robbed him of sleep by compelling him to listen to her talk nearly every evening until far into the night is entirely uncorroborated, and, though she may have been exceedingly annoying at times, we are not inclined to think he was in danger of being talked to death. Nor are her aspersions on the medical profession and request that he abandon it entitled to much consideration. When in ill health she doubtless felt, without duly appreciating the demands of his profession, that he ought not absent himself from her and told him so. Otherwise what she said was connected with the accusation of infidelity which in the last analysis constitutes the only basis for a finding of legal cruelty.

We have repeatedly held that such accusations of the wife, by the husband, when malicious and unfounded, may be such cruelty as to endanger life. *Evans v. Evans,* 82 Iowa, 462; *Haight v. Haight,* (Iowa) 82 N. W. 443. The difference in the situation of the husband is manifest. If innocent, he is not likely to regard seriously idle suspicious, even though lodged against him by his wife, nor is the

effect on his character and position in society to be compared to that upon a female. On this ground the Supreme Court of Texas has held this charge against the husband does not amount to cruelty, unless it is shown that from this temperament or calling it has or will be likely to produce mental suffering beyond the ordinary effect which such a charge would naturally have upon a man. *McAllister v. McAllister,* 71 Texas, 695 (10 S. W. 294). In *Carpenter v. Carpenter,* 30 Kan. 712 (2 Pac. 122, 46 Am. Rep. 108), the wife not only accused the husband of infidelity to the marriage relation, but sought for scandal, affecting his moral standing, to humiliate him in his own estimation, and to disgrace him in the opinion of all good people, and her conduct was adjudged to amount to extreme cruelty. In *Kline v. Kline,* 49 Mich. 419 (13 N. W. 800), the charge of adultery was coupled with other abuse indicative of ungovernable violence of temper. See, also *Holyoke v. Holyoke,* 78 Me. 404 (6 Atl. 827) ; *Robinson v. Robinson,* 66 N. H. 600 (23 Atl. 362, 15 L. R. A. 121, 49 Am. St. Rep. 632). Whether one spouse has been so treated by the other as to endanger his life is a pure question of fact. It cannot be declared as a matter of law that any particular treatment will constitute such cruelty. A course of conduct which would so impair the health of one person as to endanger life might produce no effect on another of different aspirations and sensibilities. Most men, if innocent, would decline to treat seriously idle chattering about their relations with the opposite sex, while others, owing to their associations and different temperaments, might chafe more or less seriously under an unjust charge of this kind. As to whether this feature of the case alone seriously disturbed the plaintiff, the record is silent. Possibly this was because the defendant went no farther than to indicate her suspicions, and these, as expressed to others, save in one instance, did not reach plaintiff. He attributes his change of health generally to " the trouble at home," and testified that his nervous system was wrecked,

and that he had become troubled with insomnia and forgetfulness as a result. This as seen finds scant support in the record, which indicates, also, that he is a man of strong physique and not of an especially nervous temperament, and not such a person as would be likely to be much troubled over his wife's unfounded suspicions. Undoubtedly he was greatly annoyed by her talk, and possibly his fears may have been unduly aroused by her appearance in his bed room on one occasion. But these were unfounded, and, though he may rue his bargain in marrying a woman somewhat eccentric in character and too much given to fault-finding, he is in the situation of many another husband as well as wife who bears the matrimonial yoke under like conditions in philosophic endurance. For such, when this does not amount to legal cruelty, the law affords no relief. True it is that words and deportment may work injury as deplorable as violence to the person. One of Shakespeare's characters is made to say, " I will speak daggers to her, but use none."

We are satisfied, however, upon a separate examination of the entire record that the evidence falls far short of showing that a continuance of the marriage relation by these parties will be attended with any danger to the plaintiff's life, and that, with the restoration of defendant's health, which, with appropriate treatement, seems probable, much that has been objectionable in her conduct will be obviated. She may continue to talk more than wisdom dictates, but divorce cannot be made the panacea for the infelicities of married life. If disappointment, suffering, and sorrow even be incident to the relation, it must be endured. The marriage yoke cannot be thrown off merely because it rides unevenly. The petition should have been dismissed. Appellee's motion to dismiss is merely a renewal of a like motion previously overruled and is likewise overruled, as is also appellant's motion to strike appellee's additional abstract. Appellant is allowed the sum of $150 with which

to compensate counsel for prosecuting this appeal, and the same will be taxed in her favor as a part of the costs of the case.— *Reversed.*