MARY C. SNOUFFER, Appellant, v. J. J. SNOUFFER.

**Divorce:** DESERTION. Mere refusal to cohabit with her husband while continuing to occupy the same house does not amount to desertion.

**Same:** CRUEL AND INHUMAN TREATMENT: EVIDENCE. The uncorroborated testimony of the husband concerning alleged acts of cruelty toward him, in support of his cross petition in this action, is held insufficient to authorize divorce.

**Husband and wife:** SEPARATE MAINTENANCE: CRUELTY: ADULTERY: EVIDENCE. In this action by the wife for separate maintenance on the ground of cruelty and adultery of the husband the evidence is held insufficient to authorize a decree.

*Appeal from Linn District Court.*—HON. M. P. SMITH, Judge.

THURSDAY, JANUARY 12, 1911.

SUIT by plaintiff for separate maintenance resulted in a decree of divorce being entered on a cross-petition filed by defendant. The plaintiff appeals.—*Reversed.*

*J. H. Preston,* for appellant.

*Lewis Heins,* for appellee.

LADD, J.—The plaintiff prayed for separate maintenance on the grounds of cruelty and adultery alleged to have been committed by defendant. The latter, in a cross-petition, demanded a divorce because of alleged cruelty and desertion by plaintiff. As relief was granted on defendant's cross-petition, the evidence tending to support it first may be examined.

The defendant testified that he had not cohabited with his wife since 1905 and this was admitted. His counsel contends that this amounted to desertion, although she con-

1. DIVORCE: desertion.

tinued to live in the same house and manifested no purpose of otherwise breaking the marital union. That the law is otherwise appears from *Pfannebecker v. Pfannebecker,* 133 Iowa, 425; *Kupka v. Kupka,* 132 Iowa, 191.

As bearing on the charge of cruelty, he testified that plaintiff had, upon becoming angry, come at him "with a butcher knife, a pitchfork, or anything else she could get,"

2. SAME: cruel and inhuman treatment: evidence.

and had sworn that she would kill him, and had threatened to throw blue vitrol in his face; that "as to the frequency that she has assaulted me with the butcher knife or pitchfork or poker, it got worse all the time, but toward the end I kind of didn't say anything, didn't antagonize her, unless, as I said at times, she would say something about her old man (father); he got so that I practically ordered him out" because of counseling her; that it was ten or twelve years ago that his wife came at him with a butcher knife, and did so several times since; that it was one Sunday that she threatened to throw the vitriol; that he did not know when it was that she came at him with a pitchfork; that "I wasn't afraid of her, I wasn't struck on running against her, but

I wasn't scared." This testimony was wholly uncorroborated and was explicitly denied by his wife. The circumstances that he was never afraid and was unable to state even approximately the date of any of the alleged assaults sufficiently indicate that there was no present danger to him from his wife. The court erred in entering the decree of divorce on the cross-petition.

Should there have been a decree of separate maintenance as prayed by plaintiff?

The parties lived together as happily as married people usually do fourteen years. During that time he had furnished her every luxury she desired, and she had signed every paper he had requested her to sign. Then he wanted her to join in the execution of conveyance of the stone quarry and some vacant lots he owned, as security for money to be advanced or loaned by a bank with which he proposed to carry out a certain contract he had entered into with the city of Cedar Rapids and she refused, as she explained, because of loss of confidence. He retaliated by declaring, with the purpose of making her "come to," that "she need not expect him to keep up the house longer as he could not," and then she refused to cohabit with him. Though he was able to arrange for the security, as the deed of the stone quarry to him had not been recorded, and by confessing judgment to the bank, thereby creating a lien on the lots, he appears to have persisted in his threat, and during the four years previous to the bringing of this suit contributed very meagerly to the support of his family. According to her story, when her father died he left her without means, but the father's estate was sufficient to care for the funeral charges. He refused to put up a stove when his daughter was sick; but he denied this, and no one else spoke on the subject. She objected to him melting frozen dynamite on the stove, to which he replied there was no harm, and when she was about to take the chil-

3. Husband and wife: separate maintenance: cruelty: adultery: evidence.

dren from the house, he locked her in and her nerves were so affected that she was sick for several days. She testified that on one occasion, when looking at his watch, the picture of a woman with whom the petition alleges he committed adultery, fell to the floor, and when she asked her name, he threatened to kill her. At another time, she found a picture of the same woman in his satchel. She took a key he had and procured several letters from a box in another's name purporting to be from a woman to "Darling Budd." Afterwards, she talked with him of these, warned him of his danger, and declared she would remain to see the children grown to maturity if he would furnish the means, and then cast the letters away. His response was a laugh and statement that she was foolish. She went to see him at a train about a coat he had taken by mistake. He explained that he was waiting to meet a man, but she saw the woman of whom she had seen the two pictures, and insisted that he take her home in his buggy, and, though insisting that she return the way she came, he took her part way, and striking her, put her out of the buggy. She went home and to bed. At another time, she was without food in the house and went to the room at the opera house where he spent considerable time with boon companions, and upon entering he was about to introduce her to the one with whom he was playing cards, when she swept the cards and other things from the table, chiding him for being there enjoying himself while the children were at home starving. According to her story, he seized her and swung her among the chairs to the floor, from which she rose and left, while defendant admitted having taken her by the arms and helped her from the room. The next day, seeing him near a hotel, she motioned, and as he came nearer she told him she was there to make a scene, unless he got into his buggy and got the children something to eat. He drove away with the little girl, but left her at his sister's house and did not go home, and the plaintiff

procured provisions from her parents. She testified that his face was broken out with sores for a time and that his hair came out; but there was no proof as to the cause. He associated with several other women, eating with them and some men at a hotel late at night on several occasions, being at Christy's sample room at the opera house when the same women were there, and attending several dances. Such was the evidence adduced in support of the petition.

With respect to the charge of adultery, it is enough to say that no more than a suspicion was raised. The letter introduced in evidence did not purport to be addressed to defendant, nor to be signed by the woman named in the petition; and this, in connection with finding her picture in his possession and seeing her at the train, was all the evidence connecting the two. Other associations of his indicate depravity of taste, rather than the commission of crime.

Nor are we inclined to think there was such cruelty as to endanger plaintiff's life. Aside from the circumstance of warming the dynamite on the stove, her testimony of his personal mistreatment of her was entirely uncorroborated. Moreover, no evidence of any impairment of her health was adduced, and no one reading the record can believe there was danger from physical violence of the defendant.

The trouble arose because of his omission to properly provide for his family, but this is not ground for divorce, unless amounting to such cruelty as to endanger life. But she was not without means, for upon her father's death she took, under his will, the life tenancy of property yielding an income of $100 per month, subject to an annuity of $100 payable to her mother during life. To meet expenses, she was compelled to borrow on this, but was enabled to care for the family. They had enjoyed plenty until business difficulties overtook her husband, and had she sympathized and assisted instead of blamed and he, in

manly fashion, met and undertook to overcome adverse conditions, instead of abandoning the most sacred relations of life, we would not have been troubled with this suit. Each, instead of being helpful to the other at a time when this was most needful, threw down the gauntlet of antagonism and pursued his way alone, though under the same roof. Their attitude toward each other is not involved in danger to either, and there is no occasion for the court to interfere in behalf of either.—*Reversed.*