PHOEBE A. NAUMANN, Appellee, v. EDWARD D. NAUMANN, Appellant.

**HUSBAND AND WIFE:** Separate Maintenance—Grounds—Sufficiency. Separate maintenance decree may not be entered on the ground of cruel and inhuman treatment unless the evidence would justify a decree of divorce if one were asked. Evidence reviewed, and held insufficient.

*Appeal from Marshall District Court.*—B. F. CUMMINGS, Judge.

JANUARY 10, 1918.

DECREE granting plaintiff separate maintenance. Defendant appeals.—*Reversed.*

*J. J. Wilson,* for appellant.

*Bradford & Johnson,* for appellee.

SALINGER, J.—I. The petition is grounded on the charge of cruel and inhuman treatment. Whether the decree granting separate maintenance is sustainable is a fact question. To make the decision here of any value to others than the parties to the suit, obliges us to give some statement of the facts. We have had the usual difficulty of saying enough to make our decision a precedent, and yet avoiding a fullness that will help no one.

In connection with the complaint that she was made to work too hard, plaintiff makes a point of it that she cared for the mother of the husband, who was helpless for some five years, she adds that she has pulled button weeds, has done the milking, has picked corn, with a baby in a box, worked in a hay field, stacked grain, and driven a reaper and mower. It suffices to make clear the weight to which all this is entitled on the charge of present cruelty, that the last work she did on the farm was sixteen years ago. She seems to have done the housework, with the help of her family, though it was, at times, rather large in membership.

There are complaints based upon an assumption that the defendant was a substantially wealthy man, and, notwithstanding, was niggardly in providing for plaintiff and family; that he deprived her of the proper facilities for raising chickens, fruit, and garden stuff wherewith to feed the family and buy supplies for them; that he was stingy about giving her money when asked for it, and captious about permitting her to buy on his credit at stores; that he was not a good provider; that the furniture was not what it should be; that the house was not kept in repair and paint as it should be. This might be continued at a length which has no place in an opinion, and would be of use to no one. It suffices to say that the basis is not well sustained to begin with; that defendant, instead of being a wealthy man, bought a farm with a mortgage on it, and, while he has decreased the mortgage, it still exists. It appears that he was not wholly unreasonable in objecting to such use of his credit as the plaintiff desired to make. She concedes he has some good points as a worker and provider. While there is complaint that he didn't dress the youngest daughter and the son as he should have done, and that the wife was compelled to fill the gap, the complaint is strained, and the boy spoken of as "the youngest" is nineteen. Even this "stinginess" is two-edged, and it can be

found that she was quite as close with money as he, when money was to be used for him. One instance which is not denied is that, when he wanted a suit of clothes for himself, she "just quibbled him out of it;" and it seems he hasn't a suit yet, and is ashamed to be seen in public; and he testifies that, at one time when he asked her for money, he said he ought not to give her any, because she wouldn't allow him to have any. And he gave a note for $238 to settle one grocery bill, and the grocery bill for something over a year ran to over $600; the $238 note paid the balance due; and the $600 was over and above produce, butter, eggs, fruit, meat, and flour.

We are somewhat inclined to agree with the defendant that, all things proved, he has made average provision for the comfort of his family, and has maintained a house in condition and furniture therein fairly in harmony with his means, environment, and training.

It seems he was not social; that he would never take her to places; that she never asked him to town, because she thought he wouldn't go; that he doesn't talk with her about the affairs of the farm, and she knows nothing about his business. It is a side light that she complains that, when she did go to town, she had to hitch up for herself and unhitch when she got back, to develop which it is made to appear that she had a horse and buggy for her own use, except that, once in a while, she used the horse for work on the farm.

He did not take her to see her father and mother during their sickness, nor to their funeral. He did not attend the funeral and she went alone. He refused to pay their funeral charges, and wanted to know "what account her God damn people were to him." As to this, there is no corroboration, and plaintiff herself testifies that she didn't ask him to take her to see her father and mother. Complaint made that defendant made it difficult for her broth-

ers, sisters, and other relatives to come and see her is vague, and, we think, trifling.

We have the statement of the daughter that the defendant does not talk to the mother in a kind manner; that he is cross, and she doesn't remember that he ever spoke to her in a pleasant way. We have the conclusion of the plaintiff, as a witness, that, after they had had a trial in court, and she went home on a promise the defendant had made to the judge, the defendant treated her ever since like a dog; that he never gave her a decent word; and that he told her he would make her smell hell the next time she left; that he has done this. It may be found he said, in the presence of others, that, if she kept her mouth shut, people wouldn't know she was crazy; that, when at dinner, and the men folks were talking about some machine or engine, he told them not to pay any attention to what his wife said, because she was crazy. She claims the parties have not occupied the same bed since their litigation two years earlier, and that he said he wanted nothing whatever to do with her; but she adds that she has not asked him to.

She says he offered her $1,000 to leave, and offered a third of the crop to do so; said that the house was good enough for him, and she could leave it if she didn't like it. This was undoubtedly intended by counsel as an argument in support of cruel treatment, as showing that attempting to buy her desertion affected her. The trouble is there is not so much proof that she felt bad because such propositions were made, as there is that she regretted that they were not adhered to. She points out that, after he offered her one third of the crop to leave, that he went to town, and when he returned, "there was nothing doing;" and he said he didn't have to keep a separate home for her.

He was so far from abnormally hard with his children that it appears he gave his note for $400 for an engine bought by his son, and that the boys are using this, working

on the roads and grading, though they pay no board at home.

According to plaintiff, the last time she asked defendant for money, he threw a dollar at her across the floor, and said, "God damn you, go to hell." In this she is corroborated by the testimony of her daughter. This daughter adds that, at one time when he gave her some money for the mother, he threw it on the floor, and said, "I suppose it will make her mad because I have not got more." The defendant says that on this occasion he did empty the change in his pocketbook (meaning dropped it) on the floor, and that he picked it up, gave it to the daughter, and gave her all he had at the time. He denies throwing money across the room, and says he just tossed it on the table. Plaintiff testifies she tried to have him go to church, and he just cussed the church with everything he could think of; that he just sits and cusses, and if she happened to say anything, he would tell her it would be a good thing if Norris (probably a newspaper publisher) had her; that she would make a good editor. Another daughter testifies that the father would talk back to the mother and swear at her, and sometimes he would get up and go away. Plaintiff testifies that once, when a note she had given for a sewing machine was raised, the husband didn't like the fact that advantage had been taken of her, and she got a cussing for that.

On the other hand, defendant testified that plaintiff tried to hold him back in everything he wanted to do, and the only way he could have any peace was to keep quiet; that, after they had had a former trouble in court, he tried to use her decent, and she wouldn't hear of it, and so he quit; that he don't have any trouble when he keeps his mouth shut, and so he doesn't argue with her; that he quit having talk with her because she is always contrary; that she was in the habit of contradicting him, and saying

she knew better; and the same daughter who testifies to hearing the father swear at the mother agrees with the defendant that he tried to keep out of starting quarrels, and the witness adds she never heard him start the trouble, and that the mother usually started it. This she says as a witness for the plaintiff. Defendant adds that she would call him all kinds of names, and swear at him and call him a son of a bitch, and unfit to live in a civilized country. Plaintiff herself says, "Well, I do use language that is not decent, but it is when he had me so crazy that I did not know what I was doing." The daughter who testified for the plaintiff, as well as her husband, agree that they heard the plaintiff swear at the father; that it usually occurred at the table; that "sometimes they had it every meal;" that sometimes the father would answer back, and sometimes he would not. A son testifies that the mother would swear once in a while, but not often. Recurring to the testimony of the daughter who, with her husband, was a witness for plaintiff, we find that the jangling and swearing was mutual; that they would quarrel about everything that came up; that the witness does not remember their ever agreeing on anything; that this happened several times a week. Another witness says that he has been present at times when the parents had their difficulty; that their actions are the same with reference to each other, to wit, they cuss and swear at each other, and see which could swear the most; that they quarreled about everything. "It would be just a war of words. No violence from either." The son Lem, who was a witness for both parties, said that they quarreled about everything that came up; that he couldn't say which is the most active; that this has been so ever since he can remember; that they quarreled about everything that they talked about; and he closes with the statement that "father quarreled with mother and mother

quarreled with father. Mother swears at father and father swears at mother."

Not a single act of physical violence appears. He testifies he doesn't think he ever mistreated her, and there is absolutely no evidence of any impairment to health or danger to life.

Were it an open question, the writer would incline to the opinion that a decree for separate maintenance might be sustained, though the proof fall short of the inhuman treatment required to obtain a divorce on that ground. But the question is foreclosed. It is held in *Shors v. Shors,* 133 Iowa 22, that, to obtain separate maintenance, there must be evidence warranting a decree of divorce; and when the application for it is based upon inhuman treatment, the evidence must disclose such treatment as to endanger life, the treatment must be unprovoked, and the testimony as to it must be corroborated. Notwithstanding that the decree below has the endorsement of the trial judge, who saw the living witnesses, we are still constrained to hold that the proof falls far short of the standard set in the *Shors* case; that we could not sustain a decree of divorce upon such proof, separating people who have lived together for 35 years, and have raised nine children. It follows we cannot sustain the decree of separate maintenance awarded the plaintiff.

II. If there were substantial proof of refusal to cohabit, that will not justify the decree. See *Snouffer v. Snouffer,* 150 Iowa 58; *Pfannebecker v. Pfannebecker,* 133 Iowa 425; *Schoessow v. Schoessow,* 83 Wis. 553 (53 N. W. 856); *Segelbaum v. Segelbaum,* 39 Minn. 258 (39 N. W. 492); *Fritz v. Fritz,* 138 Ill. 436 (28 N. E. 1058); *Southwick v. Southwick,* 97 Mass. 327; *Throckmorton v. Throckmorton,* 86 Va. 768 (11 S. E. 289).

In *Harnett v. Harnett,* 55 Iowa 45, it is held that separation can be sustained where there is an *utter* failure

to provide a sufficient home and food and clothing.

In *Berry v. Berry,* 115 Iowa 543, granting decree is sustained, but there was much proof of serious violence and other abuse, including grossly abusive language and impugning of chastity. *Doolittle v. Doolittle,* 78 Iowa 691, is, in substance, a replica of the *Berry* case, but perhaps a stronger showing of violence than is made in the last named case.

In *Sackrider v. Sackrider,* 60 Iowa 397, a granting of decree was sustained; but all that need be said is that it reveals violence which, on any rule, would justify decree.

In *Hall v. Hall,* 162 Iowa 653; *Van Duzer v. Van Duzer,* 70 Iowa 614; *Carlisle v. Carlisle,* 99 Iowa 247, and *Snouffer v. Snouffer,* 150 Iowa 58, we reversed the granting of the divorce on the ground of cruelty. In all of them, the evidence of cruelty was stronger than is present here; and in *Hall v. Hall,* there was serious evidence of impairment of health. So of *Pfannebecker v. Pfannebecker,* 133 Iowa 425.

*Rivers v. Rivers,* 60 Iowa, at 378, has much similarity in the facts, and refusal of decree of divorce was affirmed.

The facts in *Layton v. Layton,* 166 Iowa 74, at 76, are, in substance, as similar to the ones at bar as is ever the case. We therein held that the tendency of proof was to show merely incompatibility of temper, and said therein that, in *Wells v. Wells,* 116 Iowa 59, *Sylvester v. Sylvester,* 109 Iowa 401, 402, *Blair v. Blair,* 106 Iowa 269, and in *Olson v. Olson,* 130 Iowa 353, a divorce has been denied on a much stronger showing.

*Graves v. Graves,* 36 Iowa 310, at 314, is really a decision that one entitled to divorce need not ask it, but may obtain a separation on proper showing, and without seeking a divorce may bring an action for alimony only, though no divorce or other relief is sought, and where the wife is

separated from the husband on account of conduct on his part justifying the separation.

In *Harnett v. Harnett,* 55 Iowa 45, is found an affirmance which comes the nearest to sustaining 'the claims of 'this appellee; but, while there is much similarity, the *Harnett* case has proof of such violence as throwing the wife against a wheel, choking her, and striking her in the mouth until the blood ran out.

In *Leupold v. Leupold,* 164 Iowa 595, the charge is held sustained, but upon much stronger evidence than is present here.

· There is some language in *Beebe v. Beebe,* 10 Iowa 133, *Cole v. Cole,* 23 Iowa 433, at 436, *Wheeler v. Wheeler,* 53 Iowa 511, at 516, and *Shors v. Shors,* 133 Iowa 22, which denies the need of physical violence; but the decision turns upon facts that clearly make out legal cruelty, though no physical violence is used; and some of them have such physical violence. *Wheeler v. Wheeler,* for instance, sustains decree by "taking into consideration the acts of personal violence, the foul language, and the defendant's unfortunate habit" (intoxication).

In view of what we make the decision turn upon, it becomes unnecessary to pass upon the claim of appellant that, in the guise of decreeing a separate maintenance, the court really decreed that the parties must live together, and how their conduct should be regulated—that the only thing having a semblance to a decree of separate maintenance is decreeing a fixed allowance from husband to wife, to be expended at her discretion.

We are constrained to differ from the conclusion reached below, and the decree must be—*Reversed.*

PRESTON, C. J., LADD, EVANS, and GAYNOR, JJ., concur.