WILLIAM LEUPOLD, Appellee, v. SOPHIA LEUPOLD, Appellant.

Divorce: INHUMAN TREATMENT: ADULTERY: EVIDENCE. In this action for divorce on the ground of cruel and inhuman treatment and of adultery on the part of the wife, the evidence is reviewed and held sufficient to support both charges and to entitle the husband to a decree.

Same: ADULTERY. The fact that adultery is a crime usually committed in secrecy and therefore difficult of direct proof will not preclude a conclusion of guilt, when the facts and circumstances relied upon are consistent with such conclusion and inconsistent with the idea of innocence.

Same: DECREE. The decree awarding to each of the parties the property held by them in their own right, without alimony, and the care of the minor child to the mother for part of the time provided she conducts herself properly, with an allowance for the support of the child while in her care, is held to be equitable.

*Appeal from Emmet District Court.*—HON. A. D. BAILIE, Judge.

TUESDAY, MARCH 24, 1914.

PROCEEDING for divorce upon the grounds of cruel and inhuman treatment and adultery. Decree was entered in

favor of plaintiff, and appeal is taken by the defendant.—
*Affirmed.*

*W. A. Ladd* and *N. J. Lee* and *Kenyon, Kelleher &
O'Connor,* for appellant.

*J. W. Morse* and *E. A. Morling,* for appellee.

WITHROW, J.—I. This is a proceeding for a divorce
tried upon the issues raised by the charge, in the petition
of the husband, of cruel and inhuman treatment by the wife,
a like charge of cruel and inhuman treatment made by the
wife against her husband in a cross-petition, and the charge
of adultery by the wife with one Fred Ruckman, made in
an amendment to the petition, which was filed after the
answer and cross-petition. The trial court found that the
charges in the petition and its amendment were sustained,
and granted plaintiff a decree; it also awarded to the parties
the property then held by each, and made provision for the
education and custody of the minor child, Myrtle. From
the decree so entered the defendant, the wife, appeals.

II. The case presented is wholly of fact. The original
transcript of the evidence is before us, and we have given
to it careful consideration. Plaintiff and defendant were
married in 1893, and for eleven years pre-
ceding the trial had lived in Emmet county.
A part of this time their residence had been
on a farm owned by them, and for a short period their home
had been in Estherville, the farm having been rented and
occupied by one Peter Fank. Fred Ruckman, with whom the
wife is charged with having committed adultery, is a cousin
of William Leupold, the plaintiff and appellee. The Leupolds
had lived in Illinois before coming to Emmet county, and
Ruckman knew them there. Ruckman was the owner of an
eighty-acre farm lying near that of appellants in Emmet
county, and was unmarried. Leupold was in poor health. In

1. DIVORCE: in-
human treat-
ment: adultery:
evidence.

1906 he went to Rochester, Minn., for surgical treatment, and during his absence Ruckman was at the home for the purpose of taking care of the chores. In the winter of 1906 Leupold arranged to go to Kansas to spend the winter, seeking relief from asthma. Before going, as he testifies, he wanted to get one Insley to do the work about the farm, as he lived across the road and was convenient, but Mrs. Leupold expressed a desire that Ruckman should be employed for that purpose, and the husband thereupon employed him to do the winter chores during his absence, at $10 per month. Prior to the first winter of his absence on account of his health, while the domestic relations of the parties had not been entirely free from discord, there had been a course of life in their home which presented no acute conditions so far as affected the relations of husband and wife and their confidence in each other. But following that absence, and arising, no doubt, from her association in the home with Ruckman, it is quite clear that upon his return from the west Leupold was not welcome in his own home, and it also is clear that there had arisen between Ruckman and Mrs. Leupold feelings of sympathy in likes and purposes which made their association congenial. The appellee noticed in different ways the change in his wife's conduct towards him, and dates from that winter her refusal to occupy the same room with him, although, as we conclude from the record, there was not an absolute denial of marital rights, but they were unwillingly granted. In the winter of 1908-09 Leupold was again absent, and although as claimed by him he had arranged with another man to stay and look after the chores, Ruckman was at the home during the greater part of his absence, and this also was the case in the winter of 1909-10, when the appellant was again in Kansas. In 1910-11 the home was in Estherville. In the fall of 1911 Leupold went to Wyoming, first having arranged with one Fank to do the necessary chores, and, as he claims, stating to his wife that he did not want Ruckman there at all, but this request did not have the effect desired. During the period

when appellee was at his home after these absences, the dislike and indifference of his wife to him was marked, growing as the time went on, as the association between Mrs. Leupold and Ruckman was continued. If the appellee had occasion to distrust the fidelity of his wife, he refrained from openly declaring it, but sought by different means to bring about such a state of family life as would permit the maintenance of the home and the care of the minor daughter. We will not in detail go into the evidence upon this point, but the entire record abundantly shows that Mrs. Leupold transferred her affections to Ruckman, and that they were pleased and satisfied with the society of each other; that they were often alone together, and, especially during the absence of the husband their intimacies were such as to often occasion comment. Indeed, at times when he was present their conduct towards each other was such as to create in him feelings which had expression in remonstrance. With this state of the relations between the appellant and Ruckman satisfactorily appearing from the evidence, we turn to that which bears upon the charge of adulterous conduct.

III. A witness, Josie Fank, testified that during the summer of 1911, with her brother, she went to the Leupold home. Ruckman's automobile was standing in the front yard. She went to the kitchen door and knocked, but there was no response. Waiting for a few moments she again' knocked, when the door was unlocked or unfastened, and she went in. Mrs. Leupold came to the door, barefooted, and wearing a sack apron without sleeves. The witness testified that she remained in the house for about a half an hour, and that Mrs. Leupold told her Ruckman was there on the bed in another room, resting. At one time Ruckman called to Mrs. Leupold, and asked her when she would be ready to go to town, but did not come out of the bedroom while the witness remained. The appellant claims that there was no improper conduct between herself and Ruckman, and that he was only resting, as he often did when there. The witness, Miss Fank, is to

some extent corroborated by her brother as to the fact of her knocking at the door and receiving no response at first, and he also testified that the curtains to the windows were down. Why the door should be closed and curtains down on a day in June, with the house occupied, is not satisfactorily explained.

Another instance related is by a witness, Mrs. Warner. She testified that she was at the home one time during a winter when Leupold was away, and when Ruckman was staying there. The women visited for a short time, and then upon the request of Mrs. Leupold they went upstairs together that the visit might be continued while the beds were made. Mrs. Leupold said she was going to make Ruckman's bed, and Mrs. Warner went in the room with her. She testified that she saw in the bed a bunch of black combing hair, in a knot, which looked as if it had been fastened on the end of a braid, the way women use their loose hair for that purpose. No comment was then made upon it. The appellant denied that she ever had occupied the room with Ruckman, or that any other woman had done so. The same witness testified that on one occasion Mrs. Leupold told her that her husband, Leupold, was "no good."

Henry Leupold, father of appellee, testified that he lived at the home of his son in Estherville in 1911 for a period of about six weeks. An incident which he claimed occurred while he was there he describes as follows:

One day when I went home just a little before noon I saw Fred Ruckman there. I know Fred Ruckman. I think it was in February. I usually went around to the kitchen door; this day I went to the kitchen door where I always went; I went by Mrs. Leupold's bedroom where she slept; her little girl slept with her. It was icy on the sidewalk, and I walked close to the house. I went by the windows of the bedroom, the window that is right near the outside kitchen door. When I got to the kitchen door, I tried to open it, and it was locked or blocked, and I could not get in; I passed that bedroom, and it was partly drawn, the curtains were

drawn on every window in the house. When I got to the kitchen I heard Mr. Fred Ruckman and Mrs. Leupold talking in the bedroom; I was passing right by that window close to the house. I heard them talking and laughing in the bedroom, the two of them. The bottom of the window was about two and one-half feet from the ground, maybe three; I didn't measure it. Her bed was right near the window. It was in a kind of a low tone. When I rattled at the door they hushed. I heard this laughing and talking and the rattle of the bed; that is all. The sounds were right near the bed and on the bed. I could not have heard if they were further away. The sounds were of people close together. I knew both of their voices. I walked back on the other side of the house to see if the door was open, and that was locked, the door on the opposite side of the house; then I walked back again until I got to the kitchen door, the same path I went before. When I came there the second time I seen Fred Ruckman come out of the kitchen door, and he appeared to be in a hurry. I said, 'Good morning,' and he appeared to be in a hurry and he passed me. He said he was in a hurry. He looked blushingly. He was red in the face, he put his face down, his eyes were cast down. The door was open, and I walked into the kitchen. As I entered the kitchen, Mrs. Leupold, I heard her come out of the bedroom into the dining room, and enter into the kitchen because the door in the bedroom squeaks; she walks pretty heavy, and I heard her steps; she just opened the kitchen door when I entered the kitchen. She was red-looking, and she blushed a little, too. There was a change in her conduct toward me after that, and I saw by her actions that I was not wanted there any longer much. My son at that time was at Gruver on some business.

The cross-examination of this witness did not materially affect the statements which we have quoted as his testimony, although question was raised as to whether, with closed windows, he could have heard what he claimed. He also testified that after entering the house he passed through the bedroom, and the bed appeared the same as when slept in. Whether it had been made up that morning he did not know. Minimizing his testimony to the extent which is proper because of

interest shown by him, and his earnestness as a witness, there yet remains of it much which has not satisfactory explanation in this record. We think the presence of the two in the bedroom at the time is satisfactorily shown. Ruckman left the house as the witness entered, and immediately Mrs. Leupold came from the bedroom; and, while these facts alone do not show the act of adultery, they are circumstances which, in the light of the previous relations of the parties point strongly in that direction..

Another incident given is of a time, July 4, 1911, when all the parties, Mr. and Mrs. Leupold and their little daughter, Ruckman, and others had gone to Spirit Lake for an outing. During the day Mrs. Leupold and Ruckman were frequently together. That evening Leupold returned home with his little daughter, the wife and mother remaining at Spirit Lake. She testified that she intended to spend the night with a woman friend but instead stayed with a woman whom she met on the boat, a stranger to her, and whose name she did not remember. She testified that she did not see Ruckman that night. Ruckman testified that he stayed at a hotel that night with a man named Fitzgerald, a tile ditcher, who was not a witness on the trial, and that he did not return to Estherville with Mrs. Leupold.

These various instances all are of a most suspicious nature, and because of the known intimacy of the parties, and the manifest dislike which the wife held towards her husband, called for explanation. Her testimony upon these questions, while ultimately reaching a flat denial of anything like improper relations, was, in many instances before arriving at that point, halting and indefinite, and in one instance, when speaking of the suggestion by counsel that she had at a particular time occupied a bed with Ruckman her answer was ''I don't remember.'' It is not possible for one whose life has been pure to be forgetful as to that which is in absolute contradiction of her purity, if there was that which in fact contradicted it. Nor can we realize how the mind could for

an instant waver or be forgetful in rebutting by emphatic answer a suggestion of that nature, if there was not basis for it. It is true that later in her examination her denial was direct and unequivocal; but her manner of answering, as disclosed by the record, bore heavily against her credibility. The same should also be said of the testimony of Ruckman. Other incidents appear in the record, tending strongly to support the claim of the intimate relations between the parties, that is, as to their being together and alone, her continued contempt for her husband, her strong and willful disposition, his known desire that such intimate relations should cease, and the persistent disregard of such desire shown by both the appellant and Ruckman. The appellee testified that he first learned of the incidents upon which the claim of adultery is based during the summer after the commencement of this action, and that he had a talk with his wife at the home of a neighbor, and accused her of adultery with Ruckman, and that she admitted having had such relations, and that thereafter he amended his petition to include the charge. She denies wholly having made such admissions to him. She does admit having written a warning to Fred Ruckman, upon the bottom of a letter written him by one Nina Hornby. She stated she was in fear for herself and for him because of threats made by her husband in 1912, which was after the time he claimed to have obtained knowledge of their adulterous relations.

The act of adultery is peculiarly one of secrecy, and seldom can be proven by evidence directly showing it. The difficulty in proving it is not, however, reason for not permitting a conclusion from circumstances that such an act was committed, when the facts and circumstances so relied upon are consistent with such conclusion, and inconsistent with innocence. Realizing the effect which a finding of adultery must have upon the reputation and future life of the one accused, guarding an investigation of the evidence with a care which should be extreme in

2. SAME: adultery.

such cases, that injustice may not be done, but charged with the duty, under such conditions, of finding the truth so far as it is ascertainable from the record, regardless of the effect which it may have upon the unfortunate litigants, we are brought to the conclusion that the record in this case gives full support to the findings, reached by the trial court. The witnesses were all before that tribunal. The presiding judge heard their testimony and saw their demeanor; and, while this latter element cannot be presented to us in the printed pages which serve to submit this cause to this court, there appears throughout the record facts and circumstances attending the presentation of the evidence which to us leave strong impressions as to what was and was not credible testimony in the case.

IV. The record shows that the wife was possessed of considerable property in her own right, and that her husband also had land and property. The trial court made to appellant no allowance as alimony. Under the finding

3. SAME: decree.     she was entitled to none; but it awarded to her that which already was hers, or to which she held the legal title; the decree confirmed in each the title to the property respectively held by them.

The future care of the minor child was provided for, a part of the time with the mother, six months of each year, provided she should desist from any and all improper or unseemly relationship with Ruckman, and that while with the mother the sum of $300 per year was provided to be paid by the father during the minority of the child, unless the mother, by disregarding the prohibition of the decree, should forfeit her right to such custody.

The provisions of the decree as to such matter seem to us to be equitable, and it is in all respects—*Affirmed.*

LADD, C. J., and DEEMER and GAYNOR, JJ., concur.