CHARLES G. SIDO, appellee and cross-appellant, v. OPAL WILLIAMS SIDO, appellant.

No. 47680.

(Reported in 48 N.W.2d 799)

July 10, 1951.

Kimball, Peterson, Smith & Peterson, of Council Bluffs, for appellant.

J. A. Williams and Roy W. Smith, both of Council Bluffs, for appellee and cross-appellant.

OLIVER, C.J.—The parties were married in Council Bluffs in 1937. Mr. Sido was twenty-nine years old, she was thirty-one. He was a locomotive fireman, but shortly after the marriage was laid off and for some time had part-time employment as a laborer. He had been twice married and had a daughter, Roberta Lee, age seven or eight years. Both wives were deceased. Mrs. Sido had been married and divorced. She was then working as a waitress.

Their domestic troubles started a few months after their marriage. Mr. Sido brought Roberta Lee into the home to live. He testified Mrs. Sido found fault with everything the child did and nagged him about it so much the home was kept in a turmoil.

Mrs. Sido testified she had some trouble with Roberta Lee, "she was a little hard to manage, but I never did have to beat her." Within a short period Mr. Sido twice moved out of the home with the child. After a few months he arranged for Roberta Lee to live with others. In 1943 another attempt on his part to keep the child with him resulted in failure after a few weeks. Roberta Lee testified Mrs. Sido again objected to her presence in the home. Again in 1948 Roberta Lee, then about nineteen, visited her father for about two weeks. She testified Mrs. Sido was unfriendly and complained Roberta Lee "made her extra work and nervous."

Plaintiff testified his wife frequently quarreled with him, used vile and profane language and went into tantrums which would usually be followed by a pretended or a real illness; that her quarreling, nagging and yelling caused him to lose sleep and affected his nerves and health; that to escape this he frequently went out and walked around the streets of Council Bluffs at from midnight to 4 or 5 a.m.; that beginning about 1947 she played bingo regularly and was out from about 7 until 11 or 11:30 almost every night and that finally in February 1949 after one of their usual arguments he felt he could stand no more and left home.

Mrs. Sido testified plaintiff was responsible for their quarrels; he had a violent disposition, cursed and swore at her and physically assaulted her. She testified to a number of such assaults (denied by him) between 1937 and 1946. She had a heart ailment which she testified was not serious at the time of the marriage, but which gradually became very much worse. Her doctor testified he attended her for this November 18, 1946. He next saw her December 2, 1947. After the separation in February 1949 defendant consulted the doctor regularly. He testified she was under treatment for menopause also. He prescribed rest and told her to keep down her total physical activities within the possibilities of her heart.

For several years after the marriage Mrs. Sido from time to time took employment as a waitress and kept roomers and boarders in the home. Mr. Sido again became regularly employed as a locomotive fireman. In 1944 he borrowed $2650 from Mrs. Sido's mother and bought the home which is in the joint names of the

parties. He built a garage, painted the house, placed cabinets in the kitchen and otherwise improved the premises. Later he borrowed $1400 from his mother-in-law and purchased an automobile which stands in the names of both parties. These loans from Mrs. Sido's mother have been fully paid.

When plaintiff left the home he took with him the automobile. Mrs. Sido's mother then bought an automobile which Mrs. Sido keeps in the garage at the home and drives. Her mother does not operate an automobile.

■ I. No attempt has been made to set out in detail the testimony of the parties with reference to the various quarrels and alleged encounters. Apparently neither party was free from blame for their difficulties. There is little corroboration for the testimony of either concerning inhuman treatment by the other. The trial court found this evidence did not entitle either party to a divorce on that ground. A careful consideration of the record persuades us this conclusion was correct.

■ II. Plaintiff alleged also defendant had committed adultery. This action for divorce was instituted September 22, 1949, shortly after plaintiff had entered the home and discovered papers:

Telegram to Mrs. Opal Williams, April 28, 1949: "Arrived Hotel Chancellor Parkersburg West Virginia — Love — M. S. Palmer."

Air-mail letter from Parkersburg, West Virginia, to Mrs. Opal Williams, April 30, 1949: "Darling: Received your telegram last night * * *. You know Darling I would love to have you come but there are so many angles to consider. The biggest of course is money. You know yourself I am not overly flush with that. What with raising a family * * *. Gee Darling I miss you so darn much it hurts. Oh yes I tried to call from N.Y.C. and also from Phila. but you wasn't home. Guess you haven't been too lonesome as I didn't cancel either call until 2 a.m. * * * Write soon darling and remember I will love you all-ways. As ever, Mal."

May 6, 1949: "Dearest: Just a short note to tell you that I miss you loads. * * * All my love to my sweetheart. Your Mal."

Telegram, May 25, 1949: "Arrived Neil House Hotel Columbus Ohio—Love—M. S. Palmer."

954

August 5, 1949, Fredonia, New York: "Dearest Opal: Gee, honey, so sorry that I haven't written before * * *. Write darling and I will answer right away. All my love and kisses to you. Yours Mal."

Mrs. Sido testified: "Mr. Palmer is a friend I have met. I do not know who Mr. Palmer works for. A telegram from him signed 'love' is not unusual. He is a friend. I do not know where Mr. Palmer lives. I received this letter from him. I received the telegram. I was using the name of Opal Williams to receive these telegrams and letters." (She used the home of her mother in Council Bluffs as her address for her correspondence with men.)

Davenport, Iowa, July 30, 1949, Opal Williams, special delivery: "My Darling: Home again and am I tired. * * * Honey, I hope you didn't leave any of your belongings in Des Moines like I did. * * * I left the cord (to my shaver) hanging in the bathroom of the hotel * * *. Found your letter waiting for me, Honey. It sure was nice of you to write as soon as you got home. You must have stepped on the gas going back, for it was pretty close to 12 o'clock when we parted and if you stopped for 25 minutes in Atlantic you drove the 136 miles in less than 3 hours. * * * Honey, as tired as I am I want you to know that I enjoyed every minute we had together in Des Moines, even though I didn't accomplish anything in the way of work. * * * Well, darling, it is now 5:45 P.M. Saturday. * * * The mailman didn't leave any letters for me today either here or at the P.O. Guess my Honey had a pretty busy day Friday. * * * Darling, you sure must rate with this guy, Chet. You arrive home at 3 P.M. and he calls you at 5 P.M. How many times did he try to call you Wednesday? I'll bet he wants something he isn't going to get. Or is he? Sure wish you would turn him over to Ruth. He gets into Omaha too often to suit me. * * * Well, Sweetheart, the time is running on * * *. I love you Darling, Jack."

Davenport, Iowa, August 1, 1949: "Hello, Darling: * * * Honey, I sure didn't know what to think yesterday when I didn't get your letter. * * * Honey, I * * * wasn't mad when I called you. * * * I thought maybe your mother was sick and that your time was required by her. When you told me there was a letter (a big one) in the mail, that was good enough for me. I'm sorry if you thought I sounded mad because it sure wasn't necessary for you

to spend your money to call me back. After the first three days of last week, I think it would take more than missing a letter to make me mad. * * * Sweetheart, in just four more days we will be together again, so keep yourself well and I'll do the same. * * * with all my love, Jack."

Davenport, Iowa, August 3, 1949: "My Darling: * * * Honey, it sure is very sweet of you and your Mother to offer to let me stay at her house while I am in that territory. But Darling I don't think I should this time. I don't want to do anything that Pat [Mr. Sido] might hear about, and get ideas. After all, if your divorce is not settled out of court, or he insists that it come to a hearing he may relish something like that to talk about. And his attorney may try to make capital of it. For only a month and a half yet to go, I don't think it would be worth taking the chance of harming you.

"Will call you as I go through Council Bluffs. It may be getting pretty dark by that time, and probably you could meet me some place * * *. Sweetheart, in less than 48 hours I will be seeing you again. * * * I am looking forward to a wonderful weekend with you. * * * Until then Darling, Goodnight and Sweet Dreams. Love, Jack."

August 9, 1949, Beatrice, Nebraska: "My Darling: * * * Sweetheart you gave me a very wonderful weekend. Even though we didn't do anything too exciting, we were together; we were together a long time Friday night, from Saturday noon till Sunday morning and from Sunday noon till Monday morning. * * * I hated to leave this morning, Honey, and you have been on my mind constantly all day. I'm almost afraid you won't be there when I get back Thursday. * * * Right now, I'm wishing that we had arranged for you to be with me on this little trip, for if you were here, I'd know where you are. I'd know that there wouldn't even be the possibility of your being with Chet either Tuesday or Wednesday night. I'd know that your kisses are all mine for those three nights. * * * So for tonight, Sweet Dreams, and never never forget that I love you to. And I think God knows that I love you much more than some of your other boy friends. Jack."

Lincoln, Nebraska, August 10, 1949: "Hello Darling: * * * Gee, Honey, it was nice to hear you on the phone. * * * Honey,

956

do you suppose, maybe, some of your railroad neighbors innocently dropped a remark about you having company last Saturday and Sunday, and that one of the visitors was someone they had never seen before. Darling, even the best of people may make a remark like that, not thinking that it may prove harmful. You know, Honey, just like I unconsciously spilled the beans about you being in Davenport with me. * * * Sweetheart, his being on the corner the other night, I'll bet wasn't the first time he has tried to keep an eye on you. He probably realizes that his case is pretty hopeless, and is now and probably has been, trying to find out what you do and where you go, so as to be able to make some accusations against you. He has no doubt got to the point where he figures the only thing that will help him is to get something on you that will enable him to run down your carachter (character) I can't spell it tonight or at least to imply as much when it gets into the court. Do be very careful Darling. And I sure hope that our being together will in no way be the cause of any harm to you or your case. * * * Until I see you Thursday, Sweetheart, Goodnight and Pleasant Dreams. Jack."

There were also cards of a half-dozen traveling men, and the following letter in defendant's handwriting:

"Saturday 12:40 A.M.

"Hello Sweetheart: Just got home so you see I did not do too much breezing around. Left Ruth in Omaha kind of think she might have met someone that will work out O.K. Hope so Jack so she will not be wanting me to take her out. Honey we stopped in the Westward Ho at the Castle and had 3 bottles of beer, then all alone. Ruth and I went down to hear ............. Honey, you can believe it or not but had chances myself to go with a fellow I met, but would not go with him. Ruth met a fellow down there so I left her with him and came home."

This intimate, suggestive and licentious correspondence was directed to defendant under an assumed name and address. It indicates she offered to join one traveling correspondent in West Virginia; she drove an automobile to other cities and visited some days with another and he spent days and nights with her in Council Bluffs; apparently without objection on her part, he wrote of a third suitor, "I'll bet he wants something he isn't going to get. Or is he?"; she had other "boy friends"; she visited saloons and

was not averse to being picked up by men. Of course, these affairs were clandestine, that her husband, with whom she anticipated divorce litigation, might not hear of them and "get ideas."

Mrs. Sido was asked if she had committed adultery. She answered, "Absolutely not." The correspondence indicated various acts of misconduct which she was called upon to negative if she had any reasonable explanation. No explanation was offered. The acts shown in the correspondence stand undenied. It is true they took place after Mr. Sido left the home. However, that would not excuse them.

The circumstances lead naturally and fairly to the conclusion Mrs. Sido was guilty of adultery and are inconsistent with any rational theory of innocence. We hold her guilt was established and that plaintiff should have been granted a divorce on that ground. See Names v. Names, 67 Iowa 383, 25 N.W. 671; Leupold v. Leupold, 164 Iowa 595, 146 N.W. 55; Crilley v. Crilley, 228 Iowa 422, 292 N.W. 67.

III. The judgment, which denied a divorce to either party, was signed by the court and delivered to the clerk. Before it was filed or recorded, the court instructed the clerk to place therein a provision allowing defendant judgment for $500 for attorneys' fees. This was done without notice to plaintiff or his attorneys. Plaintiff complains the court was without jurisdiction to thus summarily amend the judgment entry. Rule 227, Rules of Civil Procedure, provides all judgments must be entered on the record of the court. This language appears also in section 11582, Code of Iowa, 1939, and in previous Codes beginning with the Revision of 1860. Under this language a judgment is not conclusive until it is entered on the proper record. No notice is required of any correction or change in a judgment if made at the term and before recording. Smith v. Willcockson, 143 Iowa 449, 451, 121 N.W. 1054; Willson v. District Court, 166 Iowa 352, 147 N.W. 766. See also article in 13 Iowa Law Review 426, 440. Hence, notice of the change was not essential to its validity.

Another complaint is the allowance was improper because the trial court did not grant a divorce to either party. This was not a prerequisite to such allowance. Wilson v. Wilson, 40 Iowa 230; Johnson v. Johnson, 241 Iowa 129, 39 N.W.2d 310.

958

We hold the allowance of attorneys' fees was not an abuse of the discretion lodged in the trial court.

IV. The record indicates neither party had substantial assets at the time of their marriage. They now own the home and its contents and an automobile. Although these accumulations were made wholly, or almost so, from the earnings of the husband, the wife is entitled to much credit for them. The home stands in the names of both parties, apparently as joint tenants or as tenants in common. The automobile also stands in the names of both. It is our conclusion plaintiff should be awarded a divorce from defendant, the automobile and one half the household goods and furniture. Defendant should be awarded one half the household goods and furniture. The title and ownership of the home should not be changed by the judgment in this case.

With instructions for judgment accordingly, the cause is—Affirmed in part, reversed in part and remanded.

All JUSTICES concur.